## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD WEISINGER, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **CIVIL ACTION NO. _____** |
| Plaintiffs, | ) ) |
| vs. | ) **CLASS ACTION COMPLAINT** |
| AMERICAN BUSINESS FINANCIAL SERVICES, INC., ANTHONY J. SANTILLI, RICHARD KAUFMAN, and ALBERT W. MANDIA, | ) **FOR VIOLATIONS OF** ) **FEDERAL SECURITIES LAWS** ) ) ) **JURY TRIAL DEMANDED** |
| Defendants. | ) |

Plaintiff, Richard Weisinger ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding American Business Financial Services, Inc. ("ABFI" or the "Company"), and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal Class Action brought by the Plaintiff on behalf of himself and a Class

consisting of all other persons who purchased the publicly traded securities of American Business Financial Services, Inc. (NASDAQ: ABFI), between January 27, 2000 and June 25, 2003, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

6.      Plaintiff, Richard Weisinger, purchased the publicly traded securities of ABFI, as set forth in the accompanying certification attached hereto and incorporated herein by reference, and has

suffered damages as a result of the wrongful acts of defendants as alleged herein.

7.      Defendant ABFI is a corporation organized and existing under the laws of Delaware with its principal place of business located at 100 Penn Square East, Philadelphia, PA 19107.

8.      Defendant Anthony J. Santilli ("Santilli") was, at all relevant times during the Class Period, the Company's Chairman, Chief Executive Officer, President, Chief Operating Officer, and Director.

9.      Defendant Richard Kaufman ("Kaufman") was, at all relevant times during the Class Period, a Company director.

10.     Defendant Albert W. Mandia ("Mandia") was, at all relevant times during the Class Period, the Company's Chief Financial Officer.

11.     Defendants Santilli,  Kaufman, and Madnia are collectively referred to hereafter as the "Individual Defendants."  During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of ABFI, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12.     Each of the Individual Defendants are liable as a direct participant with respect to a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of  ABFI securities by disseminating materially false and misleading statements and/or concealing material

adverse facts.   The scheme deceived the investing public regarding the Company's business, operations, management, and the intrinsic value of ABFI securities and caused Plaintiff and other members of the Class to purchase ABFI securities at artificially inflated prices.

13.     In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their position of control, the Individual Defendants were able to and did, directly or indirectly, control the content of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.

14.     The Individual Defendants, because of their positions with ABFI were provided with copies of ABFI's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had both the ability and opportunity to prevent their issuance or cause them to be corrected.  The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

15.     The Individual Defendants are liable, jointly and severally, as direct participants in and co-conspirators of, the wrongs complained of herein.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased the securities of ABFI between January 27, 2000 and June 25, 2003, inclusive, (the "Class Period")

and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, ABFI securities were actively traded on the NASDAQ Stock Exchange ("NASDAQ").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

18.     Plaintiff's claims are typical of the claims of the members of the Class, because plaintiffs and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

21.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class

are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether the Company's publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     Whether defendants breached any duty to convey material facts or to correct material acts previously disseminated;

(d)     Whether the defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts; and

(e)     Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### Background

22.     ABFI is a diversified financial services organization operating predominantly in the eastern and central portions of the United States.  ABFI is the parent holding company for American Business Credit, Inc. and its primary subsidiaries, HomeAmerican Credit, Inc. (doing business as Upland Mortgage), American Business Mortgage Services, Inc. and Tiger Relocation Company.

23.     Through its subsidiaries, ABFI originates, sells and services business purpose loans and home equity loans through its principal direct and indirect subsidiaries.  It also processes and purchases home equity loans from other financial institutions through the Bank Alliance Services program.

24.     Its loans primarily consist of fixed-interest-rate loans secured by first or second

mortgages on one to four family residences. The Company's customers are primarily credit-impaired borrowers who are generally unable to obtain financing from banks or savings and loan associations.

## Materially False and Misleading Statements Made During the Class Period

25.     The Class Period commences on January 27, 2000.  At that time, the Company announced record results for the Company's second fiscal quarter and six months ended December 31, 1999. ABFI reported that total revenues for the second quarter of fiscal 2000 were a record $30.6 million, an increase of 58% over the comparable prior year period.  Fee income was $3.1 million, 32% over the $2.3 million of fee income for the comparable prior year period.  Servicing income was $1.1 million, up 100% from the same year ago period.  Net income for the quarter was $3.8 million, an increase of 7% over net income of $3.5 million for the three months ended December 31, 1998. Fully diluted earnings per share for the quarter was $1.08, an increase of 17% over fully diluted earnings per share of $0.92 during the year ago period.

26.     Commenting on theses results, defendant Santilli stated:

> "Our Company's growth in originations and profitability reflect the brand awareness and marketing muscle of both our small business lending operation and retail mortgage banking business. At the same time, ABFI has been well-served by our focus on near prime borrowers, our retail origination strategy, adherence to centralized underwriting policies and controls, and our distribution strategy. We clearly believe this traditional banking orientation differentiates us from others in the sector, including Internet mortgage originators who have been challenged by the difficulties of the home mortgage industry."

27.     On February 14, 2000, the Company filed its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.

28.     On April 3, 2000, the Company issued a press release with headline: "American Business Financial Closes Its Largest Securitization Ever At $235 Million; Reports Record-Breaking Quarterly and March Production." Therein, ABFI reported that its third fiscal quarter, ending March 31, 2000, was its best quarter of production ever, with total loan originations exceeding $275 million.  Of significance was the month of March, during which the Company reported over $100 million in originations -- a record-breaking month for ABFI.  Additionally, ABFI stated on March 30, 2000, it closed a $235 million mortgage loan securitization through its three subsidiaries, American Business Credit, Inc., Upland Mortgage, and New Jersey Mortgage and Investment Company. The Company's ninth consecutive quarterly securitization, and ABFI's largest ever, represents loans originated during the Company's third fiscal quarter.

29.     Commenting on this, defendant Santilli stated:

> "I am very proud of the way this organization has focused its energies on answering the needs of our target markets.  This achievement demonstrates that, even during a period of interest rate tightening by the Federal Reserve, our needs- based, retail origination strategy is not only working, but thriving.  Our business lending and consumer mortgage divisions deserve credit for an outstanding month and quarter."

***

> "The fact that we have been able to maintain our quarterly pace of securitizations for nine consecutive quarters is testament to our focus on credit quality, the application of uniform underwriting standards, and our retail origination strategy.  We adopted these practices long before they became fashionable, and they have enabled us to sustain our profitability despite a fluctuating business and interest rate environment[.]"

30.     On April 25, 2000, ABFI announced its financial results for the third quarter ended March 31, 2000.  The Company reported earnings per share of $1.12, up 22% from $0.92 a year

earlier, and a 12% increase in net income from $3.5 million to $3.9 million. The Company also had $295 million of loan originations for the third quarter, up 40% from the same period of the previous year, and a 40 basis point decline in delinquencies to 3.18% from the previous quarter, ending December 31, 1999. As of March 31, 2000, the Company's managed portfolio was $1.7 billion, up 68% from the same period a year earlier.

31.   Focusing on this quarter's record originations, defendant Santilli stated: "We continue to build a valuable portfolio of serviced loans. The income we earn from our serviced portfolio is significant to the quality of our earnings both now and in the future." He added that ABFI's ability to originate, fund and service high quality loans enables the Company to profit from an increasing stream of fees, accretion, and servicing income. "Our growing servicing portfolio enhances the long-term value of our franchise, reduces earnings risk, and provides a growing source of cash to fund future growth[.]"

32.   Defendant Santilli further added:

> **The average coupon on ABFI's pool of business and consumer loans was almost 12% for loans originated during the quarter. This was higher than the industry average for the period of 10.4%. . . . "Because of our unique mix of business loans and home equity loans, we were able to experience a better weighted average coupon, which sets us apart from our competitors." ABFI's delinquency rate of 3.18%, which is down 40 basis points from the second fiscal quarter ended December 1999, remains one of the lowest in the industry. In addition, ABFI's "over 30 day delinquency rate" of 5.3% on a trailing 12-month basis remains well below the industry average. The Company's REO (foreclosed properties and deeds acquired in lieu of foreclosure) was 0.85% of the total portfolio, down from 0.90% at the end of December 1999.**
>
> **. . . "We attribute our asset quality to a number of factors including retail origination and centralized underwriting. Our**

> **emphasis on prompt and proactive collections is equally
> important. The absolute dollar increase in delinquencies between
> the second and third quarter was $430 thousand, while our
> overall managed portfolio grew by more than $200 million."**
> (Emphasis added.)

33. On May 12, 2000, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.

34. On June 29, 2000, ABFI issued a press release with the headline: "American Business Financial Services, Inc. Closes Its Largest Securitization Ever At $300 Million." Therein, the Company reported that it has closed a $300 million mortgage loan securitization through its three subsidiaries, American Business Credit, Inc., Upland Mortgage, and New Jersey Mortgage and Investment Corp. This was ABFI's tenth consecutive quarterly securitization, and ABFI's largest ever, represents loans originated during the Company's fourth fiscal quarter. The securitization also put ABFI past the $2 billion mark in securitized home equity loans.

35. Commenting on this, defendant Santilli stated: "I am very proud that we have been able to maintain our pace of securitizations for ten straight quarters, and now have more than $2 billion in securitized loans[.]" He further added: "These accomplishments demonstrate our continued focus on credit quality, the application of uniform underwriting standards, and our retail origination strategy. These practices are critical to our ongoing success, and central to our strategy of managed growth."

36. On September 29, 2000, ABFI issued a press release with the headline: "American Business Financial Services Closes 11th Consecutive Quarterly Securitization; Announces Improved Overcollateralization Requirements." Therein, the Company reported that it had closed a $150

million mortgage loan securitization through its three subsidiaries, American Business Credit, Inc., Upland Mortgage and New Jersey Mortgage and Investment Corp. The Company's 11th consecutive quarterly securitization represented approximately one-half of the loans originated during the Company's first fiscal quarter 2001. In addition, ABFI believed that this securitization was more economically beneficial to the Company than the prior quarter's securitization, based on improved credit enhancement levels (overcollateralization) on this pool of loans. This improvement represented an estimated 20% reduction in required overcollateralization from the prior quarter's securitization.

37.    On October 10, 2000, ABFI announced its financial results for the fourth quarter and fiscal year. ABFI reported total revenues increased 51% to a record $130.6 million in fiscal 2000, up from $86.4 million last year. Loan originations increased 30% to record levels with the Company reporting $1.1 billion in fiscal 2000. As of June 30, 2000, the Company's managed portfolio was $1.9 billion, up 63% from fiscal 1999. For the fiscal fourth quarter of 2000, the Company reported record revenues of $38.1 million, a 51% increase over $25.2 million during the prior year period. The Company also reported $316 million of loan originations for the fourth quarter, up 30% from the same period of the previous year. Additionally, the Company reported net income of $6.4 million or $1.83 per diluted share for the fiscal year ended June 30, 2000, as compared to $3.72 in fiscal 1999. In the fiscal fourth quarter, the Company reported a net loss of $5.0 million or $1.40 per diluted share compared to net income of $3.7 million or $0.98 in the prior year period.

38.    With respect to loan delinquencies, ABFI stated that loan delinquencies among the lowest in the industry: The Company reported a delinquency rate of 2.91% at June 30, 2000. Commenting on this, defendant Mandia stated: "Our well-below industry average delinquency rate

-11-

of 2.91% continues to distinguish our Company.  Down 27 basis points from the rate at March 31, 2000, our delinquency rate remains one of the lowest in the industry."

39.     Also on October 10, 2000, the Company filed its annual report with SEC on Form 10-K.  The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results.

40.     On November 9, 2000, ABFI announced its financial results for first quarter of 2001, the period ended September 30, 2000.  The Company reported earnings of $0.40 per diluted share, and net income of $1.4 million.  Additionally, ABFI achieved record revenues of $38.4 million in the first quarter of 2001, an increase of 38% over $27.8 million in the first quarter of fiscal 2000.  Because of the many benefits realized by retaining $45 million of its first quarter loan production on its balance sheet, including the ability to increase future interest income, ABFI expects to deploy this strategy from time to time in the future.  Moreover, ABFI stated:  "Delinquency Rate Among Industry's Lowest: ABFI's delinquency rate of 2.88% remains one of the lowest in the industry, down for the third consecutive quarter, 40 basis points from the first quarter ended September 30, 1999."

41.     On November 14, 2000, the Company filed its quaterly report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.

42.     On January 25, 2001, the Company announced "record" financial results for the second quarter of 2001, the period ended December 31, 2000.  ABFI reported net income of $2.4 million, or $0.72 per diluted share, for the second quarter of fiscal 2001, and net income for the first six months ended December 31, 2000 of $3.8 million, or $1.12 per diluted share.  The Company reported record revenues of $44.5 million in the second quarter of fiscal 2001, an increase of 45%

over $30.6 million in fiscal 2000.  Revenues for the first six months of fiscal 2001 reached a record

$82.9 million, a 42% increase over the prior year period.  The Company reported higher gains on sale

of loans over the year ago period, attributable primarily to a more favorable interest rate environment

and higher securitization volume.  With respect to delinquency rates, the Company stated:

> **Delinquency Rates Among Industry's Lowest: ABFI's delinquency rate of 3.33% remains one of the lowest in the industry. Santilli said, "Last year at this time, the Company reported a delinquency rate of 3.58% on a $1.5 billion portfolio. This year, we have a delinquency rate of 3.33% on a $2.3 billion portfolio. We are extremely proud of this, and we believe it is a major contributor to increasing shareholder value in this Company." Santilli added that quarter to quarter, the delinquency rate increased 45 basis points, which is a seasonal trend for the Company during the December holiday season.** (Emphasis added.)

43.     On February 13, 2001, the Company filed its quarterly report with the SEC on Form

10-Q.  The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's

previously announced financial results.

44.     On March 26, 2001, the Company issued a press release with the headline:

"American Business Financial Services, Inc. Closes 13th Consecutive Quarterly Securitization."

Therein, ABFI reported that it had closed a $275 million mortgage loan securitization through its

three subsidiaries, American Business Credit, Inc., Upland Mortgage, and American Business

Mortgage Services, Inc.  This securitization also included a lower overcollateralization requirement

than prior securitizations.  ABFI believed that the lower overcollateralization levels applicable in this

securitization would result in the realization of cash flows more quickly by ABFI than would be

realized in the prior quarter's securitization, assuming the securitized loans perform as projected.

45.     On May 1, 2001, the Company announced its financial results for the Company's third

-13-

fiscal quarter ended March 31, 2001.  ABFI achieved record revenues of $47.3 million in the third

quarter of fiscal 2001, an increase of 38% over the $34.1 million in revenues for the same period of

fiscal 2000.  Revenues for the first nine months of fiscal 2001 reached a record $130.2 million, a

41% increase over the prior year period.  The Company reported higher gains on sale of loans over

the year ago periods, primarily attributable to a more favorable interest rate environment and better

execution of its securitizations.  ABFI reported net income of $2.9 million, or $0.89 per diluted

share, for the third quarter of fiscal 2001, and net income for the nine months ended March 31, 2001,

of $6.6 million, or $2.01 per diluted share.  With respect delinquency rates, the Company stated:

> Delinquency Rate Remain Among Our Industry's Lowest: Once
> again, ABFI's delinquency rate of 3.53% remains one of the lowest in
> the nonprime industry. **"We have maintained for years that success
> in our business rests not simply with originations, but equally
> with the ability to ensure that our loans are repaid in a timely
> fashion," Ruben asserted. "The resources we have deployed in
> this area are evident in the delinquency rate we achieved in this
> quarter."** . . . as the ABFI portfolio matures, some increase in the
> overall delinquency rate will be inevitable. "Last year at this time, we
> reported a delinquency rate of 3.18% on a $1.7 billion managed
> portfolio. In today's economic environment, to have a 35 basis point
> increase on a maturing portfolio that has grown 44% in one year is
> something we are extremely proud of[.]" (Emphasis added.)

46.     Commenting on the Company's "record" results, defendant Santilli stated: "We are

very pleased with the sequential growth in revenues, earnings, and earnings per share which we have

been able to achieve during the current quarter.  On a sequential basis, our net income increased by

20%."

47.     On May 14, 2001, the Company filed its quarterly report with the SEC on Form 10-Q.

The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's

previously announced financial results.

-14-

48.     On June 28, 2001, ABFI announced that it closed its largest securitization ever at $355 million; deal puts Company past $3 billion mark in securitized home equity loans. Commenting on this, defendant Santilli stated: "We have been able to maintain our pace of quarterly securitizations for fourteen straight quarters. Our approach is critical to our ongoing success, and central to our strategy of managed growth. We are particularly pleased with the demand shown for the certificates in this securitization, and the quality of purchasers that we were able to attract."

49.     On September 25, 2001, ABFI announced its financial results for fourth quarter and year-ended June 30, 2001. The Company reported revenues of $53.1 million, a 39% increase over the $38.1 million during the prior year period. Net income for the quarter was $1.5 million, versus a loss of $5.0 million for the same period in fiscal 2000, while diluted earnings per share was $0.51, versus a loss of $1.44 per share during the prior year period. With respect to delinquencies, ABFI stated:

> Delinquency Rates remain among our industry's lowest: Once again, ABFI's delinquency rate (includes loans delinquent 31 days or more, excluding REO) of 4.13% at June 30, 2001, remains one of the lowest in the nonprime industry. ABFI's real estate owned (REO) totaled $28.4 million at June 30, 2001, as compared to $13.1 million at June 30, 2000. Although the delinquency rate is higher than 2000's figure, the Company notes that as its portfolio matures, some increase in the overall delinquency rate will be inevitable. "Also, given today's declining economy, to have a delinquency rate that consistently outperforms our industry, while we have increased our managed portfolio by 35.0% in one year is something that we are very proud of," Santilli said. **We know that today's national economic realities will make this trend higher, but we remain vigilant in our proactive focus on collections.**" (Emphasis added.)

50.     Commenting on these results, defendant Santilli stated: "The growth of ABFI is a testament to our ability to stay the course. Our success is clear evidence of the value we bring to

consumers and small businesses in communities we serve across America. We firmly believe our accomplishments come from combining the demand for our products with significant investments in training, new technology and the ongoing development of one of the most sophisticated portfolio management tools in the industry."

51.     On September 28, 2001, the Company filed its annual report with SEC on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results.

52.     On October 30, 2001, the Company announced its financial results for the Company's fiscal first quarter, ended September 30, 2001. ABFI reported net income for fiscal first quarter was $1.36 million, compared to $1.35 million for the same period last year. Net income per diluted share was $0.44, 22.2% higher than the $0.36 per diluted share in the prior year period, which was attributed to a reduction in outstanding shares. ABFI achieved total revenues of $50.7 million in fiscal first quarter of 2002, a 32% increase over the $38.4 million in revenues for the same period last year. Loan originations rose to $319.0 million during the fiscal first quarter, versus $310.9 million in the same period last year. With respect to delinquencies, ABFI reported that delinquencies (including loans delinquent 31 days or more, and excluding REO) were 5.42% at September 30, 2001, compared to 2.88% at September 30, 2000.

53.     On November 13, 2001, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.

54.     On January 23, 2002, the Company announced its financial results for the second quarter, the period ended December 31, 2001. ABFI reported net income for the fiscal second

quarter was $2.5 million, compared to $2.4 million for the same period last year.  Net income per

diluted share was $0.87, 34% higher than the $0.65 per diluted share in the prior year period, which

was attributed to a reduction in outstanding shares resulting from stock repurchases.  ABFI achieved

total revenues of $60.0 million in the fiscal second quarter of 2002, a 35% increase over the $44.5

million in revenues for the same period last year.  This represented a quarterly revenue record for

ABFI. During the quarter, ABFI recorded a $4.5 million adjustment to the value of the Company's

interest-only strips to account for the impact of increased loan prepayments being experienced

throughout the mortgage industry because of lower interest rates.  The Company also reported record

quarterly loan originations of $358.8 million, a 24% increase over the $289.4 million in originations

during the same period of fiscal 2001.

 55. Commenting on theses results, defendant Santilli stated:

> **Our results are very gratifying given the fact that the fiscal second quarter was marked by an overall downturn in the economy. Our record revenues were a result of strong loan production coupled with favorable interest rate spreads. We believe the fact that we were able to maintain our earnings momentum during a period of declining interest rates and economic conditions, including increased prepayment activity, demonstrates our commitment to doing business the right way every day, from the origination process through to the careful servicing of our portfolio."**

> **At December 31, 2001, the managed portfolio, which includes primarily loans that the Company services for others, was $2.8 billion, compared to $2.3 billion at December 31, 2000. "Our revenue growth, in part, reflects the growth and performance of our managed portfolio," Santilli said. "Every loan we originate, securitize and sell builds our managed portfolio, and, assuming it performs as we expect, the Company can realize revenue and cash streams, through such things as servicing fee income and interest accretion on our interest-only strips."**

"We are extremely proud of the way we carefully manage our portfolio," said Santilli. "This is borne out by the fact that our delinquencies (including loans delinquent 31 days or more, but excluding REO) were 6.08% at December 31, 2001. Although this is higher than our 5.42% delinquency rate we reported last quarter, it is well below the overall nonprime industry rate, which according to the most recent available statistics increased to 19.80% at September 30, 2001 from 16.04% at September 30, 2000. Certainly, the nation's economic conditions have contributed to this increase, but it is important to note that we as a Company expect delinquencies and REO to rise as the managed portfolio grows and matures, and we have prepared appropriately for it. The fact that our delinquency rate is significantly below the industry average demonstrates our belief that the collections function is as important to us as our origination function, and we work hard to make sure that the loans we make are paid back." (Emphasis added.)

56.     On February 14, 2002, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.

57.     On April 24, 2002, the Company announced its financial results for the third quarter, the period ended March 31, 2002. ABFI achieved total revenues of $65.4 million in the fiscal third quarter of 2002, a 38% increase over the $47.3 million in revenues for the same period last year. This represents a quarterly revenue record for ABFI. Revenues for the first nine months of fiscal 2002 reached a record $176.1 million, a 35.3% increase over the prior year period. The Company also reported quarterly loan originations of $328.8 million, a 20% increase over the $273.5 million in originations during the same period of fiscal 2001. Originations for the first nine months of fiscal 2002 totaled a record $1.0 billion, a 15.2% increase over the prior year period. Net income for the fiscal third quarter was $1.8 million ($0.60 per diluted share), compared to $2.9 million ($0.82 per diluted share) for the same period last year. With respect to its delinquency numbers, ABFI stated

-18-

**its 5.91% delinquency rate at March 31, 2002 is significantly less than the overall nonprime**

**industry rate, which according to the most recent industry statistics was 17.24% at December**

**31, 2001. "We believe the fact that our delinquency rate is well below the nonprime industry**

**average is an extremely important element to our overall success," defendant Santilli said.**

**"Our historical record supports our core belief that collections are every bit as important as**

**originations to deliver success in this business. We believe it's really what sets us apart."**

(Emphasis added.)

58.     On May 15, 2002, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.

59.     On August 22, 2002, the Company announced its financial results for the fourth quarter and year-ended June 30, 2003. ABFI reported record revenues of $71.8 million and $247.9 million for the fourth quarter and fiscal year respectively. Net income for the fourth quarter was $2.3 million ($0.83 per diluted share), compared to $1.5 million ($0.46 per diluted share) in the same period last fiscal year. For the 2002 full fiscal year, net income was $7.9 million, compared to $8.1 million in the last fiscal year. Net income per diluted share for the year was $2.74, up from $2.29 per diluted share for fiscal 2001, due to a reduction in outstanding shares resulting from stock repurchases. ABFI also reported that it achieved a delinquency rate of 5.57% at June 30, 2002 (includes loans delinquent 31 days or more, and excludes REO), compared to 4.13% at June 30, 2001; continued to outperform the nonprime industry, which had an average 17.24% delinquency rate at December 31, 2001. The Company's real estate owned ("REO") totaled $34.0 million at June 30, 2002, 1.11% of the total managed portfolio, as compared to $28.4 million, or 1.10%, at June 30,

2001.

60.     On September 20, 2002, the Company filed its annual report with SEC on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results.

61.     On October 31, 2002, the Company announced its financial results for first quarter ended September 30, 2002. ABFI reported that revenues for the three months ended September 30, 2002 were a record $74.5 million versus revenues of $50.7 million for the previous comparable period, an increase of 47%. Net income for the first quarter was $1.8 million ($0.61 per diluted share), compared to $1.4 million ($0.40 per diluted share) in the same period last fiscal year. With respect to delinquency rates, ABFI stated that its delinquency rate of 6.56% at September 30, 2002 (includes loans delinquent 31 days or more, and excludes REO), compared to 5.57% at June 30, 2002 and 5.42% at September 30, 2001; continued to outperform the subprime industry, which had an average 19.83% delinquency rate at March 31, 2002.

62.     Defendants Santilli added **that the delinquency rate of 6.56% is not unexpected**. (Emphasis added.) "We have often commented that we expect our delinquency rate to rise as our managed portfolio grows and matures. Additionally, the country's general economic conditions have contributed to this increase. However, we are pleased that at current levels, our managed portfolio is performing significantly better than industry averages."

63.     On November 13, 2002, the Company filed its quaterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.

64.     On January 30, 2003, the Company announced its financial results for the second

-20-

quarter of fiscal 2003, ended December 31, 2002. ABFI reported record revenues of $74.6 million during the second quarter, an increase of 24.3% over revenues of $60.0 million for the prior year period. Net income for the quarter was $2.1 million ($0.69 per diluted share), compared to $2.5 million ($0.79 per diluted share) in the prior year period. With respect to delinquency levels, ABFI stated that its delinquency rate of 6.62% at December 31, 2002 (includes loans delinquent 31 days or more, and excludes REO), compared to 6.56% at September 30, 2002, and 6.08% at December 31, 2001; continued to outperform the subprime industry, which had an average 19.03% delinquency rate at December 31, 2002. ABFI further stated that it closed a $380.0 million public Senior/Subordinated mortgage loan securitization, its third such securitization, and its 20th consecutive quarterly securitization.

65.    Commenting on these results, defendant Santilli stated" "We continue to be extremely proud of the way we manage the portfolio[.]" Defendant Santilli continued: "To have a delinquency rate that rose by only 6 basis points (.06%) from the last fiscal quarter, while growing our managed portfolio by $100 million during the quarter, demonstrates our belief that our collections function is as critical to our success as our origination function, and we work extremely hard at both."

66.    On February 14, 2003, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.

67.    On May 1, 2003, ABFI announced results for the third quarter of fiscal 2003, ended March 31, 2003. The Company reported record originations of $403.7 million during the third quarter, an increase of 22.8% over originations of $328.8 million for the prior year period. Revenues

for the three months ended March 31, 2003 were $71.8 million versus $65.4 million for the comparable period in fiscal 2002. Net income for the quarter was $0.2 million ($0.06 per diluted share), compared to $1.8 million ($0.55 per diluted share) in the comparable period a year ago. The Company further stated:

> **Delinquency rate for the managed portfolio of 6.33% at March 31, 2003 (includes loans delinquent 31 days or more, and excludes REO), compared to 6.62% at December 31, 2002, and 6.56% at September 30, 2002; continued to outperform the subprime industry, which had an average 19.03% delinquency rate at December 31, 2002.**
>
> **Santilli noted, "To have a delinquency rate that decreased 29 basis points from the last fiscal quarter, while the portfolio we manage grew by $142.3 million during the same time period, and while conducting business in uncertain economic times, demonstrates our belief that our collections function is ultimately crucial to our ongoing success. We are extremely proud of the way we manage the portfolio we service for others."** (Emphasis added.)

68.     On May 15, 2003, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.

69.     The statements referenced above in ¶¶ 25-68 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:  (1) the Company used a deception to take homes from delinquent borrowers in order keep its delinquency rate low; (2) that the deception allowed the Company to skip the normal foreclosure process more frequently; (3) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (4) as result of reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able

-22-

to securitize more loans; and (5) were thus able to collect interest income from its securitized loans and inflate its financial results.

## THE TRUTH BEGINS TO EMERGE

70.     On June 13, 2003, the Company filed a current report on Form 8-K with the SEC. Therein, ABFI disclosed that it had received a civil subpoena, dated May 14, 2003, from the Civil Division of the United States Attorney for the Eastern District of Pennsylvania ("U.S. Department of Justice") requesting that ABFI provide (among other items) the following documents and information with respect to ABFI and its lending and/or primary subsidiaries for the period from May 1, 2000 to May 1, 2003, relating to: (1) all loan files with respect to mortgage loan transactions in which the Company entered into a forbearance agreement with a borrower rather than pursue foreclosure or other contract remedies in connection with the borrower's delinquent loan; (2) the servicing, processing, foreclosing, and handling of delinquent loans, non-performing loans, and loans in default, the carrying, processing and sale of real estate owned, and forbearance agreements; and (3) agreements to sell or otherwise transfer mortgage loans (including but not limited to, any pooling or securitization agreements) or to obtain funds to finance the underwriting, origination or provision of mortgage loans, any transaction in which mortgage loans were sold or transferred, any instance in which the Company was not to service or not to act as custodian for a mortgage loan, representations and warranties made in connection with mortgage loans, secondary market loan sale schedules, and credit loss, delinquency, default, and foreclosure rates of mortgage loans.

71.     The market reacted swiftly to the news with shares of ABFI falling 20 percent or $2.13 per share to close at $8.27 per share on extremely heavy volume on June 13, 2003.

72.     On June 26, 2003, ABFI filed a current report on Form 8-K with the SEC. Therein,

the Company stated:

> American Business Financial Services, Inc. ("we") currently anticipates incurring a loss for the quarter and year ended June 30, 2003 due to our inability to complete our typical publicly underwritten quarterly securitization of loans during the last quarter of our fiscal year. The exact amount of the loss for the year ended June 30, 2003 cannot be determined at this time but such loss is expected to be in the range of $20 to $30 million. The primary factor in determining the amount of the loss is the amount of the valuation adjustment to our securitization assets. To the extent necessary, we intend to request that our lenders grant waivers of any covenants that we may not be in compliance with as a result of this loss.

> We are currently implementing other options for the sale of our loans, including whole loan sales and considering privately placed securitization transactions. In this regard, we entered into an agreement to sell up to $700 million in whole loans on a servicing-released basis, subject to certain conditions, including satisfactory completion of due diligence on each loan sale transaction. From July 1, 2003 to the date of this report, we have completed the sale of approximately $227 million of that total. We are also negotiating agreements with other lenders to sell loans on a whole loan basis. These transactions represent our move toward less reliance on quarterly publicly underwritten securitizations, in favor of whole loan sales for cash which will allow us to streamline operations, offer a broader product line and capture strategic efficiencies. These changes currently require a smaller employee base and as a result, we reduced our workforce by 153 positions. We will continue to consider securitizations as opportunities arise. A previous $300 million loan purchase facility between us and UBS Principal Financial, LLC expired pursuant to its terms, and UBS has no further obligation to purchase loans from us.

> Unlike securitizations, whole loan sales are typically structured as a sale with servicing released and we do not retain securitization assets such as interest-only strips. As a result, we will not, with respect to the whole loans sold, receive future servicing income or cash flow from interest-only strips generated in the securitization process. This will not affect our existing mortgage servicing rights or interest only strips. Although we realize significantly higher gains from securitizations than from whole loan sales, the benefit of whole loan sales is that we receive those gains immediately in cash.

> We are in the business of making and selling loans, primarily through whole loan sales and securitizations. Prior to 1995, our primary method of selling loans was through whole loan sales and we did not engage in securitizations. From January 1995 through March 31, 2003, our primary method of selling loans was through securitizations. Our method of selling loans at any given time varies according to prevailing market conditions and other factors.

73.     News of this again sent shares of ABFI plummeting.  Shares of ABFI fell 12% or $1.00 per share to close at $7.40 per share.

## UNDISCLOSED ADVERSE FACTS

74.     The market for ABFI's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, ABFI's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired ABFI securities relying upon the integrity of the market price of ABFI's securities and market information relating to ABFI, and have been damaged thereby.

75.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of ABFI's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

76.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the

Class Period, defendants made or caused to be made a series of materially false or misleading statements about ABFI's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of ABFI and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

77.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding ABFI, their control over, and/or receipt and/or modification of ABFI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning ABFI, participated in the fraudulent scheme alleged herein.

78.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial

-26-

period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

79.     Additionally, during the Class Period, the defendant Kaufman sold large portions his own Company stock.  For example, on May 22, 2003, seven (7) days after the U.S. Attorney's had commenced an investigation into the Company, defendant Kaufman sold 25,000 shares of his Company stock for proceeds totaling approximately $252,500.  Additionally, on April 1, 2003, defendant Kaufman sold 9,500 shares of his Company stock for proceed totaling approximately $104,500; on March 18, 2003, defendant Kaufman sold 20,500 shares of his Company stock for proceeds totaling approximately $246,820.  Moreover on November 22, 2002, defendant Kaufman sold 40,944 shares of his Company stock for proceeds totaling approximately $470,856; on February 4, 2002, defendant Kaufman sold 17,000 shares of his Company stock for proceeds totaling approximately $248,030; on January 28, 2002, defendant Kaufman sold 18,176 shares of his Company stock for proceeds totaling approximately $248,030; on December 12, 2001, defendant Kaufman sold 18,100 shares of his Company stock for proceeds totaling approximately $333,764. Finally, on November 30, 2001, defendant Kaufman sold 44,500 shares of his Company stock for proceeds totaling approximately $889,555.

80.     **Overall during the Class Period, defendant Kaufman sold 193,720 shares of his Company stock for proceeds totaling approximately $2,794,055**. (Emphasis added.)

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

81.     At all relevant times, the market for ABFI's securities was an efficient market for the following reasons, among others:

-27-

(a)  ABFI's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)  As a regulated issuer, ABFI filed periodic public reports with the SEC and the NASDAQ;

(c)  ABFI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  ABFI was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

82.    As a result of the foregoing, the market for ABFI's securities promptly digested current information regarding ABFI from all publicly available sources and reflected such information in ABFI's stock price.  Under these circumstances, all purchasers of ABFI's securities during the Class Period suffered similar injury through their purchase of ABFI's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

83.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful

-28-

cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ABFI who knew that those statements were false when made.

## COUNT I
### Violation of Section 10(b) of the Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

84.     Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein. This claim is asserted against all defendants.

85.     During the Class Period, defendant ABFI and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: a) deceive the investing public, including plaintiff and other Class members, as alleged herein; b) artificially inflate and maintain the market price of ABFI's securities; and c) cause plaintiff and other members of the Class to purchase ABFI's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants ABFI and the Individual Defendants, and each of them, took the actions set forth herein.

86.     These defendants: a) employed devices, schemes, and artifices to defraud; b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain

artificially high market prices for ABFI's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of ABFI, as alleged below.

87.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's securities would be based on truthful, complete and accurate information.

88.     ABFI and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of ABFI as specified herein.

89.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ABFI's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the

-30-

statements made about ABFI and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of ABFI's securities during the Class Period.

90.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; c) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

91.     These defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ABFI's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial condition

and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

92.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ABFI's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of ABFI's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired ABFI securities during the Class Period at artificially high prices and were damaged thereby.

93.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of ABFI, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their ABFI securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

94.    By virtue of the foregoing, ABFI and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

95.      As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against The Individual Defendants

96.      Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

97.      Each of the Individual Defendants acted as a controlling person of ABFI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.      In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

-33-

99.     As set forth above, ABFI and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  1/21/04

SCHIFFRIN & BARROWAY, LLP

By:
Marc A. Topaz, Esquire (# 63782)
Richard A. Maniskas, Esquire (# 85942)
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA  19004

-34-

(610) 667-7706

**CAULEY   GELLER   BOWMAN   &
RUDMAN, LLP**
Samuel H.  Rudman, Esquire
David A. Rosenfeld, Esquire
200 Broadhollow Road, Suite 406
Melville, NY 11747
(631) 367-7100

**Attorneys for Plaintiff**

**CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

I, (print name) _RICHARD C WEISINGER_ ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the Complaint and authorizes its filing.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transaction(s) in the **American Business Financial, Inc.** (Nasdaq: ABFI) security that is the subject of this action during the Class Period is/are as follows[1]:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 300 | BUY | 4/10/00 | 16.25 |
| 300 | SELL | 11/14/00 | 7.0933 |
| | | | |
| | | | |

[1]List additional transactions on a separate sheet of paper, if necessary.

5.      Plaintiff has complete investment authority and is the agent and attorney-in-fact with full power and authority to bring a suit to recover for investment losses.

6.      During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party or a class in the following actions filed under the federal securities laws (if none, so indicate): _None_

7.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _21_ day of _December_, 2003

_____
Signature

_RICHARD C WEISINGER_
Print Name