


# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

AMERICAN BUSINESS FINANCIAL
SERVICES, INC. SECURITIES LITIGATION

This Document Relates To:
All Actions

FILED
AUG 1 9 2004
MICHAEL E. KUNZ, Clerk

)
)
)
)
)
)
)
)
)
)

**MASTER FILE NO. 04-0265**

**CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Lead Plaintiffs Edward Engler and Jandre Lafate ("Lead Plaintiffs), individually and on

behalf of all other persons similarly situated, by their undersigned attorneys, allege the following

based upon personal knowledge as to their own acts, and information and belief as to all other

matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which

included, among other things, a review of the defendants' public documents, conference calls and

announcements made by defendants, United States Securities and Exchange Commission ("SEC")

filings, wire and press releases published by and regarding American Business Financial Services,

Inc. ("ABFI" or the "Company"), interviews with former employees of ABFI and its subsidiaries,

and information readily obtainable on the Internet.   Lead Plaintiffs believe that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

discovery.

## NATURE OF THE ACTION

1.` This is a federal securities Class Action brought by Lead Plaintiffs on behalf of themselves and all other persons who purchased or otherwise acquired the publicly traded securities of American Business Financial Services, Inc. ("ABFI" or the "Company"), between January 27, 2000 and June 26, 2003, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Defendant ABFI is a diversified financial services organization operating predominantly in the eastern and central portions of the United States. ABFI is the parent holding company for American Business Credit, Inc. and its primary subsidiaries, HomeAmerican Credit, Inc. (doing business as Upland Mortgage), American Business Mortgage Services, Inc. and Tiger Relocation Company. Through its subsidiaries, ABFI originates, sells and services business purpose loans and home equity loans through its principal direct and indirect subsidiaries. It also processes and purchases home equity loans from other financial institutions through the Bank Alliance Services program. ABFI's loans primarily consist of fixed-interest-rate loans secured by first or second mortgages on one to four family residences. The Company's customers are primarily credit-impaired borrowers who are generally unable to obtain financing from banks or savings and loan associations.

3. The credit-impaired market is far-reaching, and many of the techniques used by lenders in these markets are guided by the Federal Financial Institutions Examination Council (the "FFIEC"). The FFIEC guidelines, in particular, control two specific techniques used by lenders in these markets: forbearance and deferment agreements. The use of techniques, called "re-aging"

devices, are strictly guided by the FFIEC. A forbearance agreement, is an agreement negotiated between a borrower and a lender, whereby the lender foregoes a given remedy against a borrower for non-payment. Use of a forbearance agreement automatically eliminates that property from being counted as delinquent. A deferment agreement is an agreement whereby a lender defers a borrower's payment (often past-due) and rolls the amount due onto the back of the loan, to be paid back over time. The FFIEC also prescribes that lenders using these devices track the use of these devices extensively, and strictly limits their use. The FFIEC also requires that lenders track the recidivism rates of borrowers with whom these agreements are used (number of borrowers with forbearance or deferment arrangements who become delinquent again).

4.      Unbeknownst to the public, and as detailed herein, during the Class Period ABFI aggressively utilized these techniques and others in order to keep properties from being counted as delinquent and thus lowering the Company's delinquency ratio – which is a ratio resulting from the comparison between the Company's current and delinquent loans. As detailed more thoroughly herein, when a borrower missed a scheduled payment and became delinquent, ABFI immediately pressured the borrower into entering one of the above agreements, violated the FFIEC requirements and did not report the loan as delinquent -- a scheme that made it appear that the Company was carrying less delinquent loans than it actually was.

5.      Defendants were motivated to artificially lower the delinquency ratio in order to facilitate the securitization of its loans. A core function of ABFI's business model was securitization of its loans. A high delinquency ratio would make it more difficult to securitize a given pool of loans. According to the Company's Form 10-K filed with the SEC on October 10, 2000 (the "1999 Form 10-K"):

3

**The ongoing securitization of our loans is a central part of our current business strategy.** A securitization is a financing technique often used by originators of financial assets to raise capital. A securitization involves the transfer of a pool of financial assets, in our case, loans, to a trust in exchange for certificates, notes or other securities issued by the trust and representing an undivided interest in the trust assets. The transfer to the trust could involve a sale or pledge of the financial assets depending on the particular transaction. Next, we sell a portion of the certificates, notes or other securities to investors for cash. Often the originator of the loans retains servicing rights, which is the right to service the loans for a fee. The originator may also retain an interest in the cash flows generated by the securitized loans, which is subordinate to the regular interest sold to investors. This interest in the cash flows generated by the securitization is called an interest-only strip. (emphasis added).[1]

6.     As shown below, and unbeknownst to the public, during the Class Period, ABFI was only able to complete its securitizations by concealing the Company's true delinquency ratio from investors and the public.  If the public had been aware of the true quality of the loans that comprised ABFI's securitizations, the Company would have been unable to find buyers for the notes it marketed based on its loan pools during the Class Period and valued ABFI securities at their true levels.  In June, 2003, when defendants revealed to the public that they were being investigated by the Department of Justice, the public began to realize that the notes that the Company had been selling (and was currently attempting to sell) during its securitizations were of a much lower quality than represented by the Company.  As a result, investors were unwilling to purchase ABFI notes going forward -- which resulted in the inability of the Company to complete its securitization for the quarter

---

[1] The 1999 Form 10-K further stated that:
Our ability to complete securitizations depends on several factors, including:
   o   conditions in the securities markets generally including
        market interest rates;
   o   conditions in the asset-backed securities markets
        specifically; and
   o   the credit quality of our managed portfolios.

4

ended June 30, 2003. This, in turn, caused the Company to report a loss for that quarter, and to announce a change in the entire business model for ABFI away from securitizations.

7.     In response, the price of ABFI stock declined significantly.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

11.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

12.     Lead Plaintiffs, purchased the publicly traded securities of ABFI, as set forth in their certifications, previously filed in connection with their motion for appointment as Lead Plaintiffs and have suffered damages as a result of the wrongful acts of defendants as alleged herein.

5

13.     Joining Lead Plaintiffs in this Complaint are plaintiffs Operative Plasterers' and Cement Masons' International Employees Trust Fund and Operative Plasterers' and Cement Masons' Local Union Officers' and Employees' Pension Fund.  Also joining Lead Plaintiffs are James and Beth Kelly, who purchased, as set forth in their certification attached hereto as Exhibit "A", the Company's securitized notes.

14.     Defendant ABFI is a Delaware corporation with its principal place of business located at 100 Penn Square East, Philadelphia, PA 19107.  ABFI describes itself as a diversified financial services company that originates, sells and services business purpose and home equity loans primarily to credit-impaired or high-risk borrowers.

15.     Defendant Anthony J. Santilli ("Santilli") was, at all relevant times during the Class Period, the Company's Chairman, Chief Executive Officer, President, Chief Operating Officer, and Director.  Santilli signed the Company's Forms 10-K filed with the SEC on October 10, 2000, September 28, 2001, and September 20, 2002.  Santilli further, and in accordance with the requirements of the Sarbanes-Oxley Act, signed and certified the Company's Form 10-K filed with the SEC on September 20, 2002 and the Company's Forms 10-Q filed November 14, 2002, February 14, 2003, and May 15, 2003.

16.     Defendant Richard Kaufman ("Kaufman") was, at all relevant times during the Class Period, a Company director.  Kaufman signed the Company's Forms 10-K filed with the SEC on October 10, 2000, September 28, 2001, and September 20, 2002.

17.     Defendant Albert W. Mandia ("Mandia") was, at all relevant times during the Class Period, the Company's Chief Financial Officer.  Mandia signed the Company's Forms 10-K filed with the SEC on October 10, 2000, September 28, 2001, and September 20, 2002 and the Company's

Forms 10-Q filed with the SEC on February 14, 2000, May 12, 2000, November 14, 2000, February 13, 2001, May 14, 2001, November 14, 2001, February 14, 2002, May 15, 2002, November 14, 2002, February 14, 2003, and May 15, 2003.   Mandia further, and in accordance with the requirements of the Sarbanes-Oxley Act, signed and certified the Company's Form 10-K filed with the SEC on September 20, 2002 and the Company's Forms 10-Q filed November 14, 2002, February 14, 2003, and May 15, 2003.

18.      Defendants Santilli,  Kaufman, and Mandia are collectively referred to hereafter as the "Individual Defendants."  During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of ABFI, were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

19.      Each of the Individual Defendants are liable as a direct participant with respect to a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of  ABFI securities by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme deceived the investing public regarding the Company's business, operations, management, and the intrinsic value of ABFI securities and caused Lead Plaintiffs and other members of the Class to purchase ABFI securities at artificially inflated

prices and to be further damaged when ABFI's stock price declined on the revelation of defendants' fraud.

20.     In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their position of control, the Individual Defendants were able to and did, directly or indirectly, control the content of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.

21.     The Individual Defendants, because of their positions with ABFI, were provided with copies of ABFI's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had both the ability and opportunity to prevent their issuance or cause them to be corrected. The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

22.     The Individual Defendants are liable, jointly and severally, as direct participants in and co-conspirators of, the wrongs complained of herein.

## CLASS ACTION ALLEGATIONS

23.     Lead Plaintiffs bring this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased or otherwise acquired the securities of ABFI between January 27, 2000 and June 26, 2003, inclusive, and who were damaged thereby. Excluded from the Class are defendants, the officers and

directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, ABFI's securities were actively traded on the NASDAQ Stock Exchange ("NASDAQ"), and the Company has currently over 3.4 million shares outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.

25.     Lead Plaintiffs' claims are typical of the claims of the members of the Class, because they and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

26.     Lead Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class actions and securities litigation.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

28.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds

9

generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

         (a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

         (b)     Whether the Company's publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

         (c)     Whether defendants breached any duty to convey material facts or to correct material facts previously disseminated;

         (d)     Whether the defendants acted willfully, with knowledge or recklessly, in omitting and/or misrepresenting material facts; and

         (e)     Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Fraudulent Conduct

29.     Lead Plaintiff's investigation has uncovered certain former employees of the Company and its subsidiaries who are concerned about providing details of the alleged conduct because they signed confidentiality agreements with the Company.  These persons, however, have provided information which generally supports the allegations made herein to the extent they were able without violating their undertakings of confidentiality.

30.     One of the subsidiaries of ABFI, New Jersey Mortgage and Investment Company ("NJMIC") was acquired by ABFI in 1998.  NJMIC was a mortgage firm that concentrated on issuing mortgages through its strong network of mortgage brokers.  Shortly after the acquisition by

ABFI, NJMIC changed its name to American Business Mortgage Services ("AMBS"). Like many other mortgage firms that specialized in lending to high-risk potential homeowners, AMBS employed a substantial array of in house collections personnel. One such person was a former Collections Supervisor at AMBS, employed from 1997 through 2003 ("Confidential Witness 1" or "CW1").

31.     CW1 was responsible for overseeing the collections process at AMBS in connection with delinquent loans. According to CW1, mortgages were designated delinquent when a monthly payment was 30 days past-due. Once a mortgage was designated delinquent, the Collections Department attempted to contact the delinquent borrowers and negotiate payment. At the end of each month, known as "crunch time," the Collections Department was under extraordinary pressure from the corporate level to meet projected collections. According to CW1, individual collectors in his department were expected to, and did, use information they had obtained from borrowers in previous months, such as bank routing numbers, in order to **falsify** payments from borrowers who were delinquent – all so the Company could appear to be satisfying its collections targets.

32.     In 1999, shortly before the beginning of the Class Period, CW1 attended a meeting with ABFI lawyers Ben Reich and Marcy Panzer at the then Company headquarters in Bala Cynwyd, Pennsylvania. At that meeting, two devices regularly utilized by the Company, "forbearance agreements" and "deeds in lieu of foreclosure" were discussed by the Company's lawyers. Both devices were used in connection with the Company's handling of delinquent mortgages. Once a borrower became delinquent, that is, more than 30 days overdue on a monthly payment, the Company would enter into a forbearance agreement with the borrower. In exchange for not beginning the foreclosure process (which would have moved the loan immediately into delinquent

11

or uncollectable status) the Company required that the borrower execute a forbearance agreement whereby the borrower would sign the deed to the house over to the Company. Forbearance agreements enabled the Company to avoid having to record the loan as delinquent. The Company needed to minimize the number of loans that were recorded as delinquent because at the end of each fiscal quarter, the Company needed to securitize the mortgages that it held in order to generate earnings. The ratio of delinquent to timely loans, in turn, affected the ability of the Company to securitize its loan pools because the more delinquent loans contained within each securitization pool, the less desirable the securities secured by those pools were to investors. In short, if the delinquency ratio was too high, the Company would not be able to conduct the quarterly securitization – plunging the Company into financial ruin.[2]

33.     Once the deed was signed over to the Company, the Company would not formally record the deed by filing it with the appropriate county. Instead, the Company would hold the deed in its files. If the borrower was again 30 days past due on a payment, the Company avoided foreclosure on the property by simply filing the deed, recording the property as an asset, and evicting the borrower.

34.     The sign-over of the deed was referred to as a deed in lieu of foreclosure. In exchange for signing the deed over to the Company in lieu of foreclosure, the borrower was charged a fee by the Company, and received a loan in an amount equal to the fee plus whatever amount by which the

---

[2] According to the Company's 2003 Form 10-K, the Company's delinquency ratio is calculated as follows: "With respect to any Distribution Date, the percentage equivalent of a fraction (a) the numerator of which equals the aggregate Principal Balances of all Mortgage Loans that are 60 or more days delinquent, in foreclosure, converted to REO Property or in bankruptcy and are 60 or more days delinquent, as of the last day of the related Due Period and (b) the denominator of which is the current Pool Principal Balance for that Distribution Date."

12

borrower was past due – which the borrower immediately turned over to the Company as a "payment" in satisfaction of their past due debt and fee. This amount was then rolled into the back of the loan. By doing this, the loan was never recorded as delinquent. These properties would bypass the foreclosure process and go straight into real estate owned ("REO") by the Company. According to CW1, the process was simply a loan by the Company to itself so it could avoid spoiling its delinquency ratio and enabled the Company to deceive the public as to the real delinquency ratio and obtain favorable securitization of its loan pools. In addition, according to CW1, in some cases, instead of executing a forbearance agreement and deed in lieu of foreclosure at all, the Company simply loaned the borrower the past due amount, accepted that loan as payment, and rolled the amount of the loan onto the back of the original loan.

35.     The above scheme, while concealed from the public, was no secret to the Individual Defendants. In addition to the lawyers for the Company, discussed above, who instructed CW1 how to implement the scheme, the scheme was conceived and promoted by the highest levels of management during the Class Period.

36.     For example, by 2001, deeply troubled by the scheme, CW1 had complained to ABMS' president of operations because he believed that the scheme was improper. By mid-2001, CW1 was regularly refusing requests from the ABFI corporate level as well as ABFI's legal department to negotiate and execute forbearance agreements and deeds in lieu of foreclosure.

37.     The statements of CW1 are confirmed and corroborated by CW2, a vice-president of sales for American Business Credit ("ABC"), another subsidiary of ABFI. CW2 was in close communication with the executives at ABFI during his tenure with the Company, 1997 through 2003.  Specifically, CW2 stated that the Company, as a matter of course, regularly "roll[ed] the

amount past-due onto the back of the loan." This allowed the borrower to "pay [the loan] current" and avoid ABFI having to record the loan as delinquent – preserving its delinquency ratio – a vital part of the Company's profit and business model of securitization.

38.     The scheme, described by CW2 as "a glorified ponzi scheme" was well known to defendant Santilli. According to CW2, who worked closely with the highest levels at ABFI, ABFI was the "most closely held public company in America" and defendant Santilli's children ran divisions of the Company so that the family could maintain control over each aspect of the Company's business.[3]   Also according to CW2, ABFI had been misusing corporate financing mechanisms for many years. The Company issued subordinated debt on a quarterly basis, paid the executive level extravagant salaries, and used each new debt issue to pay interest on older debt issues. Predictably, these practices, unbeknownst to the public, backed the Company into a corner whereby it had to execute each quarterly debt offering or face financial ruin.

39.     Indeed, that ABFI and the Individual Defendants were orchestrating the scheme is confirmed by another former employee. CW4, an asset manager in the Real Estate Owned ("REO") department at ABFI headquarters from 1998 through 2002 stated that defendant Santilli spent inordinate amounts of time in the Collections Department at headquarters "getting the [delinquency ratio] number where they wanted it to be." CW4 is particularly informed of the issues in this litigation because she/he was responsible for overseeing the marketing and selling of properties that

---

[3] This fact is confirmed by CW3, an employee of the Company for 8 years, from 1996 through 2004. CW3 held a number of positions at ABFI, including an underwriter for the Company's offerings, and assistant vice-president of loan processing. According to CW3, the loan-servicing units of ABFI subsidiaries (the collections departments) were so closely monitored and held by senior executives at ABFI that there were referred to by ABFI as the "Operations" department of ABFI even though they were technically part of the Company's subsidiaries.

ABFI acquired through foreclosure or deeds in lieu of foreclosure.  Further, CW4 stated that regular management meetings were held where the delinquency numbers were regularly discussed at which Santilli was always present – and that delinquency numbers were particularly important to Santilli.

40.     Further corroborating the above information are the statements of CW5, a former senior vice-president of Servicing at ABFI from 1999 through 2002.   CW5 reported directly to Jeff Ruben, chief counsel and chief lending officer at ABFI.  CW5 stated that he imagined many people would be afraid to talk about the practices that went on at ABFI for fear of their future in the industry.   Adding to his reluctance to talk, CW5 said he has "seen those guys [Individual Defendants] in action and they could have 9,000 more important things on their plates and they would drop them and come looking for me."

41.     According to CW5, the FFIEC guidelines prohibited lenders from using forbearance or deferral agreements with an individual borrower more than once in a 12 month period or twice over the lifetime of a loan.  According to CW5, ABFI ignored these guidelines and was very aggressive in its use of forbearance and deferral agreements.  For example, CW5 said, "let's say I drew up a forbearance in January 2002 and then did another one for the same account in March 2002. That  is aggressive."  Not surprisingly, given ABFI's aggressive use of these devices, CW5 stated that ABFI had a recidivism rate among borrowers with forbearance agreements that was higher than the industry standard and higher than that with which he was comfortable as a professional.  In addition, CW5 said there were no audits of ABFI's adherence to the FFIEC guidelines.

42.     In addition to the above, CW5 also stated that ABFI employees as a matter of course, knowingly accepted bad checks to satisfy ABFI's months delinquency goals – and that his proposed policies to rectify this situation were never instituted by defendants.  CW5 reported the impact of

these various practices on delinquency rates "up the chain of command" with examples, in writing and through oral briefings. According to CW5, the explicit corporate directive to employees was: "Keep delinquency down. [We] don't care how you do it." When CW5 warned other senior management at the Company that the techniques that they were using would have a long-term negative impact on the Company, he was ignored. Further, according to CW5, the Company's collectors – responsible for dealing with delinquent accounts – were given extensive cash bonuses when they met their monthly delinquency goals – regardless of the fact that these goals were only met by virtue of the above detailed improper practices. CW5 attempted to halt the bonus process because it was such an incentive for improper practices, but he was overruled by his superiors.

43.     That the Individual Defendants were aware of all of the above cannot be disputed. According to CW5, ABFI executives received monthly risk management reports that set forth, *inter alia*, the various delinquency rates, loss mitigation, foreclosure, recidivism rates, and bounced checks used to "pay" loans. Similarly, CW5 stated that the highest levels of the Company, including Jeff Ruben, kept the Company's practices under "tight wraps" and close supervision so that they could be aware of all aspects of those areas of the Company's operations, including delinquency management and foreclosures.

## Materially False and Misleading Statements Made During the Class Period

44.     The Class Period commences on January 27, 2000. At that time, the Company announced record results for the Company's second fiscal quarter and six months ended December 31, 1999. ABFI reported that total revenues for the second quarter of fiscal 2000 were a record $30.6 million, an increase of 58% over the comparable prior year period. Fee income was $3.1 million, 32% over the $2.3 million of fee income for the comparable prior year period. Servicing income was

16

$1.1 million, up 100% from the prior period. Net income for the quarter was $3.8 million, an increase of 7% over net income of $3.5 million for the three months ended December 31, 1998. Fully diluted earnings per share for the quarter was $1.08, an increase of 17% over fully diluted earnings per share of $0.92 during the prior year.

45.    Commenting on theses results, defendant Santilli stated:

> "Our Company's growth in originations and profitability reflect the brand awareness and marketing muscle of both our small business lending operation and retail mortgage banking business. At the same time, ABFI has been well-served by our focus on near prime borrowers, our retail origination strategy, adherence to centralized underwriting policies and controls, and our distribution strategy. We clearly believe this traditional banking orientation differentiates us from others in the sector, including Internet mortgage originators who have been challenged by the difficulties of the home mortgage industry."

46.    On February 14, 2000, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results. In that Form 10-Q, Defendants stated that:

> Delinquent loans and leases- Total delinquencies (loans and leases with payments past due greater than 30 days) in the total managed portfolio were $53.6 million at December 31, 1999 compared to $44.0 million at September 30, 1999 and $37.6 million at June 30, 1999. Total delinquencies as a percentage of the total managed portfolio (the "delinquency rate") were 3.58% at December 31, 1999 compared to 3.28% at September 30, 1999 and 3.19% at June 30, 1999. The increase in the delinquency rate from prior periods was attributable to a December seasonal trend and the maturation of the managed portfolio, which was $1.5 billion at December 31, 1999, $1.3 billion at September 30, 1999 and $1.2 billion at June 30, 1999. Delinquent loans and leases in the available for sale portfolio (which are included in total delinquencies) at December 31, 1999 were $1.0 million, or 2.8%. In addition, at December 31, 1999, $1.2 million, or 3.4% of portfolio loans were on non-accrual status. See "Risk

Factors" in our Form 10-K for further discussion of risks associated with potential increases in delinquencies.

Published statistics gathered from a national sample of sub-prime mortgage companies by the Mortgage Information Corporation, have shown that delinquency rates averaged 14.39% as of September 1999, as compared to our current mortgage delinquency rate of 3.47% and September 30, 1999 delinquency rate of 3.53%. Even when calculating our delinquency rates on a twelve-month trailing basis, our delinquency rates were 6.1% at December 31, 1999, 6.2% at September 30, 1999, and 6.7% at June 30, 1999. **We believe that our delinquency rate is in part the result of our centralized credit underwriting structure, adherence to written underwriting standards and emphasis on collections. Our collections processes are based on early identification of loans and leases that have become credit problems, followed by an evaluation and implementation of appropriate action to work out these loans and leases**. (Emphasis added.)

47.     On April 3, 2000, the Company issued a press release with the headline: "American Business Financial Closes Its Largest Securitization Ever At $235 Million; Reports Record-Breaking Quarterly and March Production." Therein, ABFI reported that its third fiscal quarter, ending March 31, 2000, was its best quarter of production ever, with total loan originations exceeding $275 million. Of significance was the month of March, during which the Company reported over $100 million in originations -- a record-breaking month for ABFI. Additionally, ABFI stated on March 30, 2000, it closed a $235 million mortgage loan securitization through its three subsidiaries, American Business Credit, Inc., Upland Mortgage, and New Jersey Mortgage and Investment Company. The Company's ninth consecutive quarterly securitization, and ABFI's largest ever, represents loans originated during the Company's third fiscal quarter.

48.     Commenting on this, defendant Santilli stated:

"I am very proud of the way this organization has focused its energies on answering the needs of our target markets.  This achievement demonstrates that, even during a period of interest rate tightening by the Federal Reserve, our needs- based, retail origination strategy is not only working, but thriving.  Our business lending and consumer mortgage divisions deserve credit for an outstanding month and quarter."

\*\*\*

**"The fact that we have been able to maintain our quarterly pace of securitizations for nine consecutive quarters is testament to our focus on credit quality, the application of uniform underwriting standards, and our retail origination strategy.**  We adopted these practices long before they became fashionable, and they have enabled us to sustain our profitability despite a fluctuating business and interest rate environment[.]" (Emphasis added.)

49.     The statements referenced above in ¶¶ 44-48 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:  (1) that the Company was utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending **more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company

**overall managed portfolio grew by more than $200 million."**
(Emphasis added.)

52.     On May 12, 2000, the Company filed its quarterly report with the SEC on Form 10-Q.

The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's

previously announced financial results.  In that Form 10-Q, Defendants stated that:

> Delinquent loans and leases- Total delinquencies (loans and leases
> with payments past due greater than 30 days) in the total managed
> portfolio were $54.0 million at March 31, 2000 compared to $53.6
> million at December 31, 1999 and $44.0 million at September 30,
> 1999. Total delinquencies as a percentage of the total managed
> portfolio (the "delinquency rate") were 3.18% at March 31, 2000
> compared to 3.58% at December 31, 1999 and 3.28% at September
> 30, 1999 on a total managed portfolio of $1.7 billion at March 31,
> 2000, $1.5 billion at December 31, 1999 and $1.3 billion at
> September 30, 1999. Delinquent loans and leases in the available for
> sale portfolio (which are included in total delinquencies) at March 31,
> 2000 were $1.0 million, or 3.0%. In addition, at March 31, 2000, $2.3
> million, or 6.9% of portfolio loans were on non-accrual status. See
> "Risk Factors" in our Form 10-K for further discussion of risks
> associated with potential increases in delinquencies.
>
> Published statistics gathered from a national sample of sub-prime
> mortgage companies by the Mortgage Information Corporation, have
> shown that delinquency rates averaged 14.39% as of September 1999,
> as compared to our current mortgage delinquency rate of 3.33% and
> September 30, 1999 delinquency rate of 3.53%. Even when
> calculating our delinquency rates on a twelve-month trailing basis,
> our delinquency rates were 5.3% at March 31, 2000, 6.1% at
> December 31, 1999, and 6.2% at September 30, 1999. **We believe
> that our delinquency rate is in part the result of our centralized
> credit underwriting structure, adherence to written underwriting
> standards and emphasis on collections. Our collection processes
> are based on early identification of loans and leases that have
> become credit problems, followed by an evaluation and
> implementation of appropriate action to work out these loans and
> leases**. (Emphasis added.)

21

to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly

reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize

its loans; and (7) that the Company was thus able to collect interest income from its securitized loans

and inflate its financial results.

50.    On April 25, 2000, ABFI announced its financial results for the third quarter ended

March 31, 2000. The Company reported earnings per share of $1.12, up 22% from $0.92 a year

earlier, and a 12% increase in net income from $3.5 million to $3.9 million. The Company also had

$295 million of loan originations for the third quarter, up 40% from the same period of the previous

year, and a 40 basis point decline in delinquencies to 3.18% from the previous quarter, ending

December 31, 1999. As of March 31, 2000, the Company's managed portfolio was $1.7 billion, up

68% from the same period a year earlier.

51.    In connection therewith, defendant Santilli stated:

> The average coupon on ABFI's pool of business and consumer loans
> was almost 12% for loans originated during the quarter. This was
> higher than the industry average for the period of 10.4%.  . . .
> "Because of our unique mix of business loans and home equity loans,
> we were able to experience a better weighted average coupon, which
> sets us apart from our competitors." ABFI's delinquency rate of
> 3.18%, which is down 40 basis points from the second fiscal quarter
> ended December 1999, remains one of the lowest in the industry. In
> addition, ABFI's "over 30 day delinquency rate" of 5.3% on a trailing
> 12-month basis remains well below the industry average. The
> Company's REO (foreclosed properties and deeds acquired in lieu of
> foreclosure) was 0.85% of the total portfolio, down from 0.90% at the
> end of December 1999.
>
> . . . **"We attribute our asset quality to a number of factors
> including retail origination and centralized underwriting. Our
> emphasis on prompt and proactive collections is equally
> important. The absolute dollar increase in delinquencies between
> the second and third quarter was $430 thousand, while our**

53.     On June 29, 2000, ABFI issued a press release with the headline: "American Business Financial Services, Inc. Closes Its Largest Securitization Ever At $300 Million." Therein, the Company reported that it has closed a $300 million mortgage loan securitization through its three subsidiaries, American Business Credit, Inc., Upland Mortgage, and New Jersey Mortgage and Investment Corp. This was ABFI's tenth consecutive quarterly securitization, and ABFI's largest ever, represents loans originated during the Company's fourth fiscal quarter. The securitization also put ABFI past the $2 billion mark in securitized home equity loans.

54.     Commenting on this, defendant Santilli stated: "I am very proud that we have been able to maintain our pace of securitizations for ten straight quarters, and now have more than $2 billion in securitized loans[.]" He further added: **These accomplishments demonstrate our continued focus on credit quality, the application of uniform underwriting standards, and our retail origination strategy. These practices are critical to our ongoing success, and central to our strategy of managed growth.**" (Emphasis added.)

55.     On September 29, 2000, ABFI issued a press release with the headline: "American Business Financial Services Closes 11th Consecutive Quarterly Securitization; Announces Improved Overcollateralization Requirements." Therein, the Company reported that it had closed a $150 million mortgage loan securitization through its three subsidiaries, American Business Credit, Inc., Upland Mortgage and New Jersey Mortgage and Investment Corp. The Company's 11th consecutive quarterly securitization represented approximately one-half of the loans originated during the Company's first fiscal quarter 2001.

56.     The statements referenced above in ¶¶ 50-55 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts

22

which were known to defendants or recklessly disregarded by them: (1) that the Company was utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending **more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize its loans; and (7) that the Company was thus able to collect interest income from its securitized loans and inflate its financial results..

57.    On October 10, 2000, ABFI announced its financial results for the fourth quarter and fiscal year. ABFI reported total revenues increased 51% to a record $130.6 million in fiscal 2000, up from $86.4 million last year. Loan originations increased 30% to record levels with the Company reporting $1.1 billion in fiscal 2000. As of June 30, 2000, the Company's managed portfolio was $1.9 billion, up 63% from fiscal 1999. For the fiscal fourth quarter of 2000, the Company reported record revenues of $38.1 million, a 51% increase over $25.2 million during the prior year period. The Company also reported $316 million of loan originations for the fourth quarter, up 30% from the same period of the previous year. Additionally, the Company reported net income of $6.4 million or $1.83 per diluted share for the fiscal year ended June 30, 2000, as compared to $3.72 in

fiscal 1999.  In the fiscal fourth quarter, the Company reported a net loss of $5.0 million or $1.40 per diluted share compared to net income of $3.7 million or $0.98 in the prior year period.

58.     With respect to loan delinquencies, ABFI stated that loan delinquencies were among the lowest in the industry: The Company reported a delinquency rate of 2.91% at June 30, 2000. Commenting on this, defendant Mandia stated: "Our well-below industry average delinquency rate of 2.91% continues to distinguish our Company.  Down 27 basis points from the rate at March 31, 2000, our delinquency rate remains one of the lowest in the industry."

59.     Also on October 10, 2000, the Company filed its annual report with SEC on Form 10-K.  The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results.  The Form 10-K further stated that:

> In servicing loans and leases, we typically send an invoice to obligors on a monthly basis advising them of the required payment and its due date. We begin the collection process immediately after a borrower fails to make a monthly payment. When a loan or lease becomes 45 to 60 days delinquent, it is referred to our legal collection group for the initiation of foreclosure proceedings or other legal remedies. In addition, after a loan or lease becomes 61 days delinquent, our loss mitigation unit becomes involved. Our loss mitigation unit tries to reinstate a delinquent loan or lease, seek a payoff, or occasionally enter into a modification agreement with the borrower to avoid foreclosure. All proposed work-out arrangements are evaluated on a case-by-case basis, based upon the borrower's past credit history, current financial status, cooperativeness, future prospects and the reasons for the delinquency. If the loan or lease becomes delinquent 61 days or more and a satisfactory work-out arrangement with the borrower is not achieved or the borrower declares bankruptcy, the foreclosure, replevin or other legal action is initiated. Legal action may be initiated prior to a loan or lease becoming delinquent over 60 days if management determines that the circumstances warrant such action.

24

60.     Additionally, the Form 10-K trumpeted the Company's ability to collect and "find solutions" for delinquent loans "other than foreclosure," specifically stating:

> To our knowledge, we are one of very few lenders that has an in-house legal staff dedicated to the collection of delinquent loans and the handling of bankruptcy cases. As a result, we believe our delinquent loans are reviewed from a legal perspective earlier in the collection process than is the case with loans made by traditional lenders so that troublesome legal issues can be noted and, if possible, resolved earlier. Our in-house legal staff also attempts to find solutions for delinquent loans, other than foreclosure. Every loan is analyzed to compare the property value against the loan balance and solutions are presented to the borrower based on the results of that analysis.

61.     The statements referenced above in ¶¶ 57-60 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:  (1) that the Company was utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending **more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize

its loans; and (7) that the Company was thus able to collect interest income from its securitized loans and inflate its financial results.

62.     On November 9, 2000, ABFI announced its financial results for the first quarter of 2001, the period ended September 30, 2000.  The Company reported earnings of $0.40 per diluted share, and net income of $1.4 million.  Additionally, ABFI achieved record revenues of $38.4 million in the first quarter of 2001, an increase of 38% over $27.8 million in the first quarter of fiscal 2000.  Because of the many benefits realized by retaining $45 million of its first quarter loan production on its balance sheet, including the ability to increase future interest income, ABFI expects to deploy this strategy from time to time in the future.  Moreover, ABFI stated:  "Delinquency Rate Among Industry's Lowest: ABFI's delinquency rate of 2.88% remains one of the lowest in the industry, down for the third consecutive quarter, 40 basis points from the first quarter ended September 30, 1999."

63.     On November 14, 2000, the Company filed its quarterly report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results.  That Form 10-Q also stated that:

> Delinquent loans and leases. Total delinquencies (loans and leases with payments past due greater than 30 days) in the total managed portfolio were $61.6 million at September 30, 2000 compared to $55.8 million at June 30, 2000 and $54.0 million at March 31, 2000. Total delinquencies as a percentage of the total managed portfolio (the "delinquency rate") were 2.88% at September 30, 2000 compared to 2.91% at June 30, 2000 and 3.18% at March 31, 2000 on a total managed portfolio of $2.1 billion at September 30, 2000, $1.9 billion at June 30, 2000 and $1.7 billion at March 31, 2000. Delinquent loans and leases held as available for sale (which are included in total delinquencies) at September 30, 2000 were $3.1 million, or 4.0%. In addition, at September 30, 2000, $4.1 million, or 5.3% of available for sale loans were on non-accrual status.

64.     The statements referenced above in ¶¶ 62-63 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them: (1) that the Company was utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending **more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize its loans; and (7) that the Company was thus able to collect interest income from its securitized loans and inflate its financial results.

65.     On January 25, 2001, the Company announced "record" financial results for the second quarter of 2001, the period ended December 31, 2000. ABFI reported net income of $2.4 million, or $0.72 per diluted share, for the second quarter of fiscal 2001, and net income for the first six months ended December 31, 2000 of $3.8 million, or $1.12 per diluted share. The Company reported record revenues of $44.5 million in the second quarter of fiscal 2001, an increase of 45% over $30.6 million in fiscal 2000. Revenues for the first six months of fiscal 2001 reached a record $82.9 million, a 42% increase over the prior year period. The Company reported higher gains on sale

27

of loans over the year ago period, attributable primarily to a more favorable interest rate environment and higher securitization volume. With respect to delinquency rates, the Company stated:

> **Delinquency Rates Among Industry's Lowest: ABFI's delinquency rate of 3.33% remains one of the lowest in the industry. Santilli said, "Last year at this time, the Company reported a delinquency rate of 3.58% on a $1.5 billion portfolio. This year, we have a delinquency rate of 3.33% on a $2.3 billion portfolio. We are extremely proud of this, and we believe it is a major contributor to increasing shareholder value in this Company." Santilli added that quarter to quarter, the delinquency rate increased 45 basis points, which is a seasonal trend for the Company during the December holiday season.** (Emphasis added.)

66.    On February 13, 2001, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results. The Form 10-Q further stated that:

> Delinquent loans and leases. Total delinquencies (loans and leases with payments past due greater than 30 days) in the total managed portfolio were $76.3 million at December 31, 2000 compared to $61.6 million at September 30, 2000 and $55.8 million at June 30, 2000. Total delinquencies as a percentage of the total managed portfolio (the "delinquency rate") were 3.33% at December 31, 2000 compared to 2.88% at September 30, 2000 and 2.91% at June 30, 2000 on a total managed portfolio of $2.3 billion at December 31, 2000, $2.1 billion at September 30, 2000 and $1.9 billion at June 30, 2000. The 45 basis point increase in the December 31, 2000 delinquency rate is a seasonal trend for us during the December holiday season. At December 31, 1999, the delinquency rate was 3.58%.
>
> Delinquent loans and leases held as available for sale (which are included in total delinquencies) at December 31, 2000 were $2.7 million, or 3.7%. In addition, at December 31, 2000, $4.2 million, or 5.7% of available for sale loans were on non-accrual status.

28

67.    On March 26, 2001, the Company issued a press release with the headline: "American Business Financial Services, Inc. Closes 13th Consecutive Quarterly Securitization." Therein, ABFI reported that it had closed a $275 million mortgage loan securitization through its three subsidiaries, American Business Credit, Inc., Upland Mortgage, and American Business Mortgage Services, Inc.

68.    The statements referenced above in ¶¶ 65-67 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:  (1) that the Company was utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending **more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize its loans; and (7) that the Company was thus able to collect interest income from its securitized loans and inflate its financial results.

69.    On May 1, 2001, the Company announced its financial results for the Company's third fiscal quarter ended March 31, 2001.  ABFI achieved record revenues of $47.3 million in the third

quarter of fiscal 2001, an increase of 38% over the $34.1 million in revenues for the same period of fiscal 2000. Revenues for the first nine months of fiscal 2001 reached a record $130.2 million, a 41% increase over the prior year period. The Company reported higher gains on the sale of loans over the year ago periods, primarily attributable to a more favorable interest rate environment and better execution of its securitizations. ABFI reported net income of $2.9 million, or $0.89 per diluted share, for the third quarter of fiscal 2001, and net income for the nine months ended March 31, 2001, of $6.6 million, or $2.01 per diluted share. With respect delinquency rates, the Company stated:

> **Delinquency Rate Remain Among Our Industry's Lowest: Once again, ABFI's delinquency rate of 3.53% remains one of the lowest in the nonprime industry. "We have maintained for years that success in our business rests not simply with originations, but equally with the ability to ensure that our loans are repaid in a timely fashion," Ruben asserted. "The resources we have deployed in this area are evident in the delinquency rate we achieved in this quarter."** . . . as the ABFI portfolio matures, some increase in the overall delinquency rate will be inevitable. "Last year at this time, we reported a delinquency rate of 3.18% on a $1.7 billion managed portfolio. In today's economic environment, to have a 35 basis point increase on a maturing portfolio that has grown 44% in one year is something we are extremely proud of[.]" (Emphasis added.)

70.    Commenting on the Company's "record" results, defendant Santilli stated: "We are very pleased with the sequential growth in revenues, earnings, and earnings per share which we have been able to achieve during the current quarter. On a sequential basis, our net income increased by 20%."

71.     On May 14, 2001, the Company filed its quarterly report with the SEC on Form 10-Q.
The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's
previously announced financial results. The Form 10-Q further stated that:

> Delinquent loans and leases. Total delinquencies (loans and leases
> with payments past due greater than 30 days) in the total managed
> portfolio were $86.1 million at March 31, 2001 compared to $76.3
> million at December 31, 2000 and $61.6 million at September 30,
> 2000. Total delinquencies as a percentage of the total managed
> portfolio (the "delinquency rate") were 3.53% at March 31, 2001
> compared to 3.33% at December 31, 2000 and 2.88% at September
> 30, 2000 on a total managed portfolio of $2.4 billion at March 31,
> 2001, $2.3 billion at December 31, 2000 and $2.1 billion at
> September 30, 2000. The increase in delinquencies and delinquency
> percentages was mainly due to the seasoning of the managed portfolio
> together with the leveling of the origination of new loans and the
> resulting slow down of the growth of the managed portfolio. As the
> managed portfolio continues to season we expect the delinquency rate
> to continue to increase.

> Delinquent loans and leases held as available for sale (which are
> included in total delinquencies) at March 31, 2001 were $2.1 million,
> or 3.0% compared to $2.7 million, or 3.7% at December 31, 2000,
> and $3.1 million, or 4.0% at September 30, 2000. The accrual of
> interest income on loans is suspended when a loan is contractually
> delinquent for 90 days or more. At March 31, 2001, $4.1 million, or
> 5.7% of available for sale loans were on non-accrual status compared
> to $4.2 million, or 5.7% at December 31, 2000, and $4.1 million, or
> 5.3% at September 30, 2000.

72.     On June 28, 2001, ABFI announced that it closed its largest securitization ever at
$355 million; deal puts Company past $3 billion mark in securitized home equity loans.
Commenting on this, defendant Santilli stated: "We have been able to maintain our pace of quarterly
securitizations for fourteen straight quarters. Our approach is critical to our ongoing success, and

central to our strategy of managed growth.  We are particularly pleased with the demand shown for the certificates in this securitization, and the quality of purchasers that we were able to attract."

73.    The statements referenced above in ¶¶ 69-72 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:  (1) that the Company was utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending **more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize its loans; and (7) that the Company was thus able to collect interest income from its securitized loans and inflate its financial results.

74.    On September 25, 2001, ABFI announced its financial results for the fourth quarter and year-ended June 30, 2001.  The Company reported revenues of $53.1 million, a 39% increase over the $38.1 million during the prior year period.  Net income for the quarter was $1.5 million, versus a loss of $5.0 million for the same period in fiscal 2000, while diluted earnings per share was

$0.51, versus a loss of $1.44 per share during the prior year period.  With respect to delinquencies, ABFI stated:

> Delinquency Rates remain among our industry's lowest:  Once again, ABFI's delinquency rate (includes loans delinquent 31 days or more, excluding REO) of 4.13% at June 30, 2001, remains one of the lowest in the nonprime industry.  ABFI's real estate owned (REO) totaled $28.4 million at June 30, 2001, as compared to $13.1 million at June 30, 2000. Although the delinquency rate is higher than 2000's figure, the Company notes that as its portfolio matures, some increase in the overall delinquency rate will be inevitable. "Also, given today's declining economy, to have a delinquency rate that consistently outperforms our industry, while we have increased our managed portfolio by 35.0% in one year is something that we are very proud of," Santilli said. **We know that today's national economic realities will make this trend higher, but we remain vigilant in our proactive focus on collections**."  (Emphasis added.)

75.      Commenting on these results, defendant Santilli stated:  "The growth of ABFI is a testament to our ability to stay the course.  Our success is clear evidence of the value we bring to consumers and small businesses in communities we serve across America. **We firmly believe our accomplishments come from combining the demand for our products with significant investments in training, new technology and the ongoing development of one of the most sophisticated portfolio management tools in the industry.**" (Emphasis added.)

76.      On September 28, 2001, the Company filed its annual report with SEC on Form 10-K. The Company's Form 10-K was signed by the Individual Defendants and reaffirmed the Company's previously announced financial results.  The Form 10-K further stated that:

> In servicing loans, we typically send an invoice to obligors on a monthly basis advising them of the required payment and its due date. We begin the collection process immediately after a borrower fails to make a monthly payment. When a loan becomes 45 to 60 days delinquent, it is referred to our legal collection group for the initiation of foreclosure proceedings or other legal remedies. In addition, after

33

a loan becomes 61 days delinquent, our loss mitigation unit becomes involved. Our loss mitigation unit tries to reinstate a delinquent loan, seek a payoff, or occasionally enter into a modification agreement with the borrower to avoid foreclosure. All proposed work-out arrangements are evaluated on a case-by-case basis, based upon the borrower's past credit history, current financial status, cooperativeness, future prospects and the reasons for the delinquency. If the loan becomes delinquent 61 days or more and a satisfactory work-out arrangement with the borrower is not achieved or the borrower declares bankruptcy, a foreclosure, replevin or other legal action is initiated. Legal action may be initiated prior to a loan becoming more than 60 days delinquent if management determines that the circumstances warrant such action.

77.     Additionally, the Form 10-K trumpeted the Company's ability to collect and "find solutions" for delinquent loans "other than foreclosure," specifically stating:

To our knowledge, we are one of very few lenders that has an in-house legal staff dedicated to the collection of delinquent loans and the handling of bankruptcy cases. As a result, we believe our delinquent loans are reviewed from a legal perspective earlier in the collection process than is the case with loans made by traditional lenders so that troublesome legal issues can be noted and, if possible, resolved earlier. Our in-house legal staff also attempts to find solutions for delinquent loans, other than foreclosure. Every loan is analyzed to compare the property value against the loan balance and solutions are presented to the borrower based on the results of that analysis.

78.     The statements referenced above in ¶¶ 74-77 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them: (1) that the Company was utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending

34

**more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize its loans; and (7) that the Company was thus able to collect interest income from its securitized loans and inflate its financial results.

79.     On October 30, 2001, the Company announced its financial results for the Company's fiscal first quarter, ended September 30, 2001. ABFI reported net income for the fiscal first quarter was $1.36 million, compared to $1.35 million for the same period last year. Net income per diluted share was $0.44, 22.2% higher than the $0.36 per diluted share in the prior year period, which was attributed to a reduction in outstanding shares. ABFI achieved total revenues of $50.7 million in the fiscal first quarter of 2002, a 32% increase over the $38.4 million in revenues for the same period last year. Loan originations rose to $319.0 million during the fiscal first quarter, versus $310.9 million in the same period last year. With respect to delinquencies, ABFI reported that delinquencies (including loans delinquent 31 days or more, and excluding REO) were 5.42% at September 30, 2001, compared to 2.88% at September 30, 2000.

80.     On November 13, 2001, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's previously announced financial results. The Form 10-Q further stated that:

Delinquent loans and leases. Total delinquencies (loans and leases with payments past due greater than 30 days, excluding real estate owned) in the total managed portfolio were $146.8 million at September 30, 2001 compared to $107.0 million at June 30, 2001 and $86.1 million at March 31, 2001. Total delinquencies as a percentage of the total managed portfolio were 5.42% at September 30, 2001 compared to 4.13% at June 30, 2001 and 3.53% at March 31, 2001 on a total managed portfolio of $2.7 billion at September 30, 2001, $2.6 billion at June 30, 2001 and $2.4 billion at March 31, 2001. The increase in delinquencies and delinquency percentages was mainly due to the continued decline in economic conditions and the seasoning of the managed portfolio together with the leveling of the origination of new loans and the resulting slow down of the growth of the managed portfolio. As the managed portfolio continues to season we expect the delinquency rate to continue to increase.

81.     The statements referenced above in ¶¶ 79-80 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them: (1) that the Company was utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending **more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize

its loans; and (7) that the Company was thus able to collect interest income from its securitized loans and inflate its financial results.

82.     On January 23, 2002, the Company announced its financial results for the second quarter, the period ended December 31, 2001.  ABFI reported net income for the fiscal second quarter was $2.5 million, compared to $2.4 million for the same period last year.  Net income per diluted share was $0.87, 34% higher than the $0.65 per diluted share in the prior year period, which was attributed to a reduction in outstanding shares resulting from stock repurchases.  ABFI achieved total revenues of $60.0 million in the fiscal second quarter of 2002, a 35% increase over the $44.5 million in revenues for the same period last year.  This represented a quarterly revenue record for ABFI. During the quarter, ABFI recorded a $4.5 million adjustment to the value of the Company's interest-only strips to account for the impact of increased loan prepayments being experienced throughout the mortgage industry because of lower interest rates.  The Company also reported record quarterly loan originations of $358.8 million, a 24% increase over the $289.4 million in originations during the same period of fiscal 2001.

83.     Commenting on theses results, defendant Santilli stated:

> Our results are very gratifying given the fact that the fiscal second quarter was marked by an overall downturn in the economy. Our record revenues were a result of strong loan production coupled with favorable interest rate spreads. We believe the fact that we were able to maintain our earnings momentum during a period of declining interest rates and economic conditions, including increased prepayment activity, demonstrates our commitment to doing business the right way every day, from the origination process through to the careful servicing of our portfolio."

> At December 31, 2001, the managed portfolio, which includes primarily loans that the Company services for others, was $2.8 billion, compared to $2.3 billion at December 31, 2000. "Our revenue

the total managed portfolio were 6.56% at September 30, 2002 compared to 5.57% and 5.91% at June 30, 2002 and March 31, 2002, respectively. The increases in delinquencies and delinquency percentages in the first quarter of fiscal 2003 were mainly due to the impact on our borrowers of continued uncertain economic conditions, which may include the reduction in other sources of credit to our borrowers, and the seasoning of the managed portfolio. In addition, the delinquency percentage has increased due to increased prepayment rates resulting from refinancing activities. Refinancing is not typically available to delinquent borrowers, and therefore the remaining portfolio is experiencing a higher delinquency rate. A leveling in the growth of the managed portfolio as a result of higher prepayment rates and decreases in the growth of the origination of new loans also contributed to the increase in the delinquency percentage in the first quarter of fiscal 2003 from June 30, 2002. As the managed portfolio continues to season, and if economic conditions continue to lag or worsen, the delinquency rate may continue to increase. Delinquent loans and leases held as available for sale on our balance sheet increased from $5.9 million at June 30, 2002 to $6.7 million at September 30, 2002 primarily due to repurchases of loans from our mortgage securitization trusts.

95.     The statements referenced above in ¶¶ 93-95 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:  (1) that the Company was utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending **more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the

45

Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize its loans; and (7) that the Company was thus able to collect interest income from its securitized loans and inflate its financial results.

96.     On January 30, 2003, the Company announced its financial results for the second quarter of fiscal 2003, ended December 31, 2002.  ABFI reported record revenues of $74.6 million during the second quarter, an increase of 24.3% over revenues of $60.0 million for the prior year period. Net income for the quarter was $2.1 million ($0.69 per diluted share), compared to $2.5 million ($0.79 per diluted share) in the prior year period.  With respect to delinquency levels, ABFI stated that its delinquency rate of 6.62% at December 31, 2002 (includes loans delinquent 31 days or more, and excludes REO), compared to 6.56% at September 30, 2002, and 6.08% at December 31, 2001; continued to outperform the subprime industry, which had an average 19.03% delinquency rate at December 31, 2002.   ABFI further stated that it closed a $380.0 million public Senior/Subordinated mortgage loan securitization, its third such securitization, and its 20th consecutive quarterly securitization.

97.     Commenting on these results, defendant Santilli stated "We continue to be extremely proud of the way we manage the portfolio[.]" Defendant Santilli continued:   **"To have a delinquency rate that rose by only 6 basis points (.06%) from the last fiscal quarter, while growing our managed portfolio by $100 million during the quarter, demonstrates our belief that our collections function is as critical to our success as our origination function, and we work extremely hard at both**." (Emphasis added.)

46

98.     On February 14, 2003, the Company filed its quarterly report with the SEC on Form

10-Q.  The Company's Form 10-Q was signed by defendant Mandia and reaffirmed the Company's

previously announced financial results.  The Form 10-Q further stated:

> Delinquent loans and leases. Total delinquencies (loans and leases
> with payments past due greater than 30 days, excluding REO) in the
> total managed portfolio were $220.9 million at December 31, 2002
> compared to $209.9 million and $170.8 million at September 30,
> 2002 and June 30, 2002, respectively. Total delinquencies as a
> percentage of the total managed portfolio were 6.62% at December
> 31, 2002 compared to 6.56% and 5.57% at September 30, 2002 and
> June 30, 2002, respectively. The increases in delinquencies and
> delinquency percentages in fiscal 2003 were mainly due to the impact
> on our borrowers of continued uncertain economic conditions, which
> may include the reduction in other sources of credit to our borrowers,
> and the seasoning of the managed portfolio.  In addition, the
> delinquency percentage has increased due to increased prepayment
> rates resulting from refinancing activities. Refinancing is not typically
> available to delinquent borrowers, and therefore the remaining
> portfolio is experiencing a higher delinquency rate. A leveling in the
> growth of the managed portfolio as a result of higher prepayment
> rates and decreases in the growth of the origination of new loans also
> contributed to the increase in the delinquency percentage in fiscal
> 2003 from June 30, 2002. As the managed portfolio continues to
> season, and if economic conditions continue to lag or worsen, the
> delinquency rate may continue to increase. Delinquent loans and
> leases held as available for sale on our balance sheet increased from
> $5.9 million at June 30, 2002 to $9.5 million at December 31, 2002
> primarily due to repurchases of loans from our mortgage
> securitization trusts. See "Results of Operations -- Provision for
> Credit Losses" for further detail of the impact of delinquencies.

99.     The statements referenced above in ¶¶ 97-99 were each materially false and

misleading because they failed to disclose and misrepresented the following material adverse facts

which were known to defendants or recklessly disregarded by them:  (1) that the Company was

utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the

Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending **more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize its loans; and (7) that the Company was thus able to collect interest income from its securitized loans and inflate its financial results.

100.   On May 1, 2003, ABFI announced results for the third quarter of fiscal 2003, ended March 31, 2003.  The Company reported record originations of $403.7 million during the third quarter, an increase of 22.8% over originations of $328.8 million for the prior year period. Revenues for the three months ended March 31, 2003 were $71.8 million versus $65.4 million for the comparable period in fiscal 2002.  Net income for the quarter was $0.2 million ($0.06 per diluted share), compared to $1.8 million ($0.55 per diluted share) in the comparable period a year ago.  The Company further stated:

> Delinquency rate for the managed portfolio of 6.33% at March 31, 2003 (includes loans delinquent 31 days or more, and excludes REO), compared to 6.62% at December 31, 2002, and 6.56% at September 30, 2002; continued to outperform the subprime industry, which had an average 19.03% delinquency rate at December 31, 2002.

> **Santilli noted, "To have a delinquency rate that decreased 29 basis points from the last fiscal quarter, while the portfolio we manage grew by $142.3 million during the same time period, and while conducting business in uncertain economic times, demonstrates our belief that our collections function is ultimately crucial to our ongoing success. We are extremely proud of the way we manage the portfolio we service for others."** (Emphasis added.)

101.    May 14, 2003, unbeknownst to the public, ABFI received a civil subpoena (the "Subpoena"), from the Civil Division of the United States Attorney for the Eastern District of Pennsylvania ("U.S. Department of Justice") requesting that ABFI provide (among other items) the following documents and information with respect to ABFI and its lending and/or primary subsidiaries for the period from May 1, 2000 to May 1, 2003, relating to: (1) all loan files with respect to mortgage loan transactions in which the Company entered into a forbearance agreement with a borrower rather than pursue foreclosure or other contract remedies in connection with the borrower's delinquent loan; (2) the servicing, processing, foreclosing, and handling of delinquent loans, non-performing loans, and loans in default, the carrying, processing and sale of real estate owned, and forbearance agreements; and (3) agreements to sell or otherwise transfer mortgage loans (including but not limited to, any pooling or securitization agreements) or to obtain funds to finance the underwriting, origination or provision of mortgage loans, any transaction in which mortgage loans were sold or transferred, any instance in which the Company was not to service or not to act as custodian for a mortgage loan, representations and warranties made in connection with mortgage loans, secondary market loan sale schedules, and credit loss, delinquency, default, and foreclosure rates of mortgage loans.

**The Truth Begins to Emerge**

102.     The very next day, on May 15, 2003, the Company filed its quarterly report with the

SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendant Mandia and reaffirmed

the Company's previously announced financial results.  The Form 10-Q further stated that:

> Delinquent loans and leases. Total delinquencies (loans and leases
> with payments past due greater than 30 days, excluding REO) in the
> total managed portfolio were $220.1 million at March 31, 2003
> compared to $220.9 million and $209.9 million at December 31, 2002
> and September 30, 2002, respectively.   Total delinquencies as a
> percentage of the total managed portfolio were 6.33% at March 31,
> 2003 compared to 6.62% and 6.56% at December 31, 2002 and
> September 30, 2002, respectively. Delinquencies at June 30, 2002
> were $170.8 million or 5.57% of the managed portfolio. Although
> delinquencies at March 31, 2003 have declined, increases in
> percentages in fiscal 2003 from fiscal 2002 were mainly due to the
> impact on our borrowers of continued uncertain economic conditions,
> which may include the reduction in other sources of credit to our
> borrowers, and the seasoning of the managed portfolio. **These factors
> have also resulted in a significant increase in the usage of
> deferment and forbearance arrangements, which impact the
> aging status of loans for purposes of delinquency reporting
> described above**. In addition, the delinquency percentage had
> increased due to increased prepayment rates resulting from
> refinancing activities.   Refinancing is not typically available to
> delinquent borrowers, and therefore the remaining portfolio is
> experiencing a higher delinquency rate. A leveling in the growth of
> the managed portfolio as a result of higher prepayment rates and
> decreases in the growth of the origination of new loans also
> contributed to the increase in the delinquency percentage in fiscal
> 2003 from June 30, 2002.  As the managed portfolio continues to
> season, and if economic conditions continue to lag or worsen, the
> delinquency rate may continue to increase. Delinquent loans and
> leases held as available for sale on our balance sheet increased
> slightly from $5.9 million at June 30, 2002 to $6.0 million at March
> 31, 2003. Compared to December 31, 2002 and September 30, 2002
> delinquencies decreased primarily due to liquidations through sales
> of loans repurchased from our mortgage securitization trusts. See
> "Results of Operations -- Provision for Credit Losses" for further
> detail of the impact of delinquencies. (Emphasis added.)

103.   In this Form 10-Q, the Company began to reveal the use of forbearance agreements

and the Company's procedures in connection therewith.  Specifically:

> Deferment and Forbearance Arrangements. Our policies and practices regarding deferment and forbearance arrangements, like all of our collections policies and practices, are designed to manage customer relationships, maximize collections and avoid foreclosure or repossession if reasonably possible. From time to time, borrowers are confronted with events, usually involving hardship circumstances or temporary financial setbacks that adversely affect their ability to continue payments on their loan for some period of time. To assist borrowers during a hardship period, we may agree to enter into a deferment or forbearance arrangement. When economic conditions, such as those that exist at the present time, cause the value of the real estate securing our loans to rise, thereby lowering loan-to-value ratios, we are able to be more accommodating to borrowers who request a deferment or forbearance arrangement as relief from their temporary financial hardship.
>
> **These arrangements permit us to reset the contractual status of a loan in our managed portfolio from delinquent to current based upon evidence, which in our judgment indicates a significant potential for eventual resumption of contractual payments.**
>
> **In a deferment arrangement, which is initiated solely at the request of the borrower,** we make advances to a securitization trust on behalf of the borrower in amounts equal to the delinquent loan payments. The borrower must repay the advances either at the termination of the loan or on a monthly payment plan. Borrowers must provide written documentation outlining their hardship and requesting deferment. Other principal guidelines applicable to the deferment process are: (i) the borrower may have up to six payments deferred during the life of the loan and must have a history demonstrating the ability to repay in post-deferment periods; (ii) no more than three payments may be deferred during a twelve-month period; and (iii) the borrower must have made a minimum of six timely payments on the loan and twelve months must have passed since the last deferment in order to qualify for a new deferment request.
>
> **In a forbearance arrangement, which also is initiated solely at the request of a borrower,** we also make advances to a securitization

trust on behalf of the borrower in amounts equal to the delinquent loan payments and we also advance any unpaid taxes, insurance premiums or similar assessments. The borrower must repay the advances in addition to their regular monthly payment until the advances are paid in full and the borrower must exhibit the ability to remit post-forbearance payments in a timely manner. A forbearance is part of a formal agreement in which the borrower must execute a deed in lieu of foreclosure, subject to exceptions based on local laws and regulations and individual borrower circumstances. We retain the unrecorded deed in safekeeping until such time as the entire advance amount is repaid. If the borrower subsequently defaults before repaying the advances in full, we have the option to record the deed after providing proper notification to the borrower and a reasonable period of time to cure. The recording of the deed allows us to proceed with a deed in lieu of foreclosure action, which is typically less complex and less costly than a foreclosure action. Other principal guidelines applicable to the forbearance process are: (i) the subject loan must be at least nine months old; (ii) the loan must be a minimum of two payments delinquent and it is preferred that the deferment option be exhausted prior to the initiation of a forbearance process; and (iii) the borrower must not have excessive liens against the real estate collateralizing the loan.

We do not enter into a deferment or forbearance arrangement based solely on the fact that a loan meets the criteria for one of the arrangements. Our use of the arrangements depends upon a new credit decision, our view of prevailing economic conditions and an individual's circumstances, which vary from borrower to borrower. Because deferral and forbearance arrangements are account management tools which help us to manage customer relationships, maximize collection opportunities and increase the value of our account relationships, the application of these tools generally is subject to constantly shifting complexities and variations in the marketplace. We continually review and assess the policies and practices to make sure they are in alignment with the goals we have set for them. We modify or permit exceptions to the policies and practices from time to time and from one reporting period to another.

In most cases, a loan is considered current if the borrower immediately begins payment under the terms of the deferment or forbearance arrangement and we do not reflect it as a delinquent loan in our delinquency statistics, although if the agreed terms are not

52

adhered to by the borrower, the account status may be reversed and collection actions resumed.

104.    The statements referenced above in ¶¶ 101, 103-104 were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to defendants or recklessly disregarded by them:  (1) that the Company was utilizing forbearance agreements and deeds in lieu of foreclosure to keep delinquent loans out of the Company's delinquency ratio so as to deceive the public as to the true ratio; (2) that the Company was, improperly rolling delinquent amounts on to the back end of outstanding loans – by extending **more** credit to an already delinquent borrower – and then arbitrarily designating the loans as current; (3) that the Company was knowingly accepting bad checks to satisfy monthly delinquency goals and using information they had obtained from borrowers such as a bank routing number in order to falsify payments from borrowers in order to appear to be in line with collection targets; (4) that the Company was repeatedly ignoring the FFIEC guidelines; (5) that the deception helped the Company to reduce its delinquency rate in its $3.6 billion loan portfolio; (6) that only as result of improperly reducing its delinquency rate in its $3.6 billion loan portfolio, the Company was able to securitize its loans; (7) that the Company was thus able to collect interest income from its securitized loans and inflate its financial results; (8) that the impact that the forbearance and deferment agreements had in depressing the Company's delinquency ratio was substantial; and (9) that the forbearance and deferment agreements were not initiated solely at the behest of borrowers, but rather, were actively solicited by the Company and its employees.

105.    On June 13, 2003, the Company filed a current report on Form 8-K with the SEC in which it disclosed ABFI's receipt of the Subpoena.

53

106.    The market reacted swiftly to this disastrous news, with shares of ABFI falling 20 percent or $2.13 per share to close at $8.27 per share on extremely heavy volume on June 13, 2003.

107.    On June 26, 2003, ABFI filed a current report on Form 8-K with the SEC.  Therein, the Company stated:

> American Business Financial Services, Inc. ("we") currently anticipates incurring a loss for the quarter and year ended June 30, 2003 due to our inability to complete our typical publicly underwritten quarterly securitization of loans during the last quarter of our fiscal year. The exact amount of the loss for the year ended June 30, 2003 cannot be determined at this time but such loss is expected to be in the range of $20 to $30 million. The primary factor in determining the amount of the loss is the amount of the valuation adjustment to our securitization assets. To the extent necessary, we intend to request that our lenders grant waivers of any covenants that we may not be in compliance with as a result of this loss.
>
> We are currently implementing other options for the sale of our loans, including whole loan sales and considering privately placed securitization transactions. In this regard, we entered into an agreement to sell up to $700 million in whole loans on a servicing-released basis, subject to certain conditions, including satisfactory completion of due diligence on each loan sale transaction. From July 1, 2003 to the date of this report, we have completed the sale of approximately $227 million of that total. We are also negotiating agreements with other lenders to sell loans on a whole loan basis. **These transactions represent our move toward less reliance on quarterly publicly underwritten securitizations, in favor of whole loan sales for cash which will allow us to streamline operations, offer a broader product line and capture strategic efficiencies.** These changes currently require a smaller employee base and as a result, we reduced our workforce by 153 positions. We will continue to consider securitizations as opportunities arise. A previous $300 million loan purchase facility between us and UBS Principal Financial, LLC expired pursuant to its terms, and UBS has no further obligation to purchase loans from us.
>
> Unlike securitizations, whole loan sales are typically structured as a sale with servicing released and we do not retain securitization assets such as interest-only strips. As a result, we will not, with respect to

54

the whole loans sold, receive future servicing income or cash flow from interest-only strips generated in the securitization process. This will not affect our existing mortgage servicing rights or interest only strips. Although we realize significantly higher gains from securitizations than from whole loan sales, the benefit of whole loan sales is that we receive those gains immediately in cash.

We are in the business of making and selling loans, primarily through whole loan sales and securitizations. Prior to 1995, our primary method of selling loans was through whole loan sales and we did not engage in securitizations. From January 1995 through March 31, 2003, our primary method of selling loans was through securitizations. Our method of selling loans at any given time varies according to prevailing market conditions and other factors. (Emphasis added.)

108.    The ability of ABFI to continue to securitize its loans was crucial to the Company's business model.   The Company was only able to complete the necessary securitizations by concealing the true debt ratios from the public.  If the public had been aware of the true quality of the loans that comprised ABFI's securitizations, the Company would have been unable to find buyers for the notes it marketed based on its loan pools much earlier than June, 2003 and valued ABFI securities at their true levels.   Once defendants revealed to the public that they were being investigated by the Department of Justice, the public began to realize that the notes that the Company had been selling (and was currently attempting to sell) during its securitizations were of a much lower quality than represented by the Company.  As a result, investors were unwilling to purchase the notes – which resulted in the inability of the Company to complete the above securitization. This, in turn, caused the Company to report a loss for that quarter, and to announce a change in the entire business model for ABFI.

109.   This news of the Company's inability to complete its necessary securitization again sent shares of ABFI plummeting.  Shares of ABFI fell 12% or $1.00 per share down from the prior day's close, to close at $7.40 per share.

110.   The market for ABFI's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, ABFI's securities traded at artificially inflated prices during the Class Period.  Lead Plaintiffs and other members of the Class purchased or otherwise acquired ABFI securities relying upon the integrity of the market price of ABFI's securities and market information relating to ABFI, and have been damaged thereby.

111.   During the Class Period, defendants materially misled the investing public, thereby inflating the price of ABFI's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

112.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Lead Plaintiffs and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about ABFI's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of ABFI and its business, prospects and operations, thus causing the Company's securities to be

56

overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing or acquiring the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

113.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding ABFI, their control over, and/or receipt and/or modification of ABFI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning ABFI, participated in the fraudulent scheme alleged herein.

114.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

115.    Additionally, during the Class Period, as the chart below depicts, during the two and one-half year Class Period, Defendants sold substantial percentages of their beneficially-owned shares of ABFI.

| Defendant | Date(s) | Number sold | % beneficial c/s holdings | $/Sh | Proceeds ($) |
|---|---|---|---|---|---|
| Kaufman | 9/17/02 | 52,785 | | $3.936 | |
| | 9/17/02 | 22,604 | 17.69% | $13.550 | 306,284.20 |
| | 11/08 - 11/02 | 15,944 | 15.15% | 11.75 - 11.8725 | 189,255 |
| | 11/12 - 13/02 | 6,000 | 6.72% | 11.25 - 11.60 | 69,600 |
| | 11/14/02 | 5,000 | 6.00% | 11.60 - 11.90 | 59,500 |
| | 11/18/02 | 5,000 | 6.39% | 11.44 - 12.25 | 61,250 |
| | 11/22/02 | 9,000 | 12.28% | $11.500 | 103,500 |
| | 3/10/03 | 2,100 | 3.27% | $13.182 | 27,686.20 |
| | 3/12 - 13/03 | 700 | 1.13% | 12.88 - 13.2825 | 9,296 |
| | 3/14 - 17/03 | 10,600 | 17.25% | 12.1078 - 12.3416 | 130,804 |
| | 3/18/03 | 7,100 | 13.96% | $12.041 | 85,491.10 |
| | 4/01/03 | 9,500 | 21.71% | 10.80 - 11.00 | 104,500 |
| | 5/20-21/03 | 10,700 | 31.23% | 10.25 - 10.61 | 113,527 |
| | 5/22/03 | 14,300 | 60.68% | 10.00 - 10.10 | 144,430 |
| Santilli | 10/07/02 | 1,000 | | - | |
| | 11/25/02 | 50 | | - | |
| | 12/18/02 | 400 | | - | |
| Mandia | 10/17/02 | 3,866 | | - | |
| | 6/02/03 | 4,000 (OE) | | $5.058 | |

116.    Defendant Kaufman's sales of ABFI securities were suspicious in both timing and amount.  Throughout the Class Period he sold a total of 118,548 shares of ABFI common stock, worth approximately $1,405,123.  Indeed, at the end of the Class Period, Kaufman retained only

9,266 shares, an amount representing a mere 7.8% of the beneficial holdings which he held at the start of the Class Period. Even more striking is the fact that Kauffman sold more than 60% of his beneficial holdings a mere five days after the Company's last positive Form 10-Q filing on May 15, 2003 and just nineteen days after the Company's last glowing announcement of its quarterly financial results on May 1, 2003. This sale, representing the largest percentage sale Kaufman made during the Class Period, was made less than three weeks before the Company's first shocking disclosure on June 13, 2003. None of Kaufman's sales were part of a planned sales program. Moreover, Kaufman's sales during the Class Period far exceeded his sales during the entire four years preceding the Class Period, during which he made no open market sales.[4]

117.    Defendant Santilli's sales of ABFI securities were also suspicious particularly with respect to their timing. During the Class Period, Santilli sold nearly 2,000 shares of ABFI common stock. Santilli, like Kaufman, had not made one single open market sale during the four years preceding the Class Period. Thus, in comparison to his pre-Class Period activity, Santilli's Class Period sales seem extraordinary. Indeed, Santilli sold more shares during two months of the Class Period than he had during the entire four years preceding the Class Period. None of Santilli's sales were part of a planned sales program.[5]

---

[4] In addition, as a result of his position as a director of the Company, defendant Kaufman received substantial compensation. Specifically, each year Kaufman received compensation of $20,000, plus $1,500 per month, plus $1,500 for each Board meeting he attended.

[5] In addition, as a result of his positions at the Company, defendant Santilli received substantial compensation. In 2000, Santilli received a salary of $548,438, a bonus of $575,000, and 12,100 options to purchase ABFI stock. In 2001 Santilli received a salary of $639,688, a bonus of $989,688, and 12,100 options to purchase ABFI stock. In 2002, Santilli received a salary of $710,844, a bonus of $694,313, and 12,100 options to purchase ABFI stock. In 2003, Santilli received a salary of $755,221, and a bonus of $229,639.

118.    Defendant Santilli's sales of ABFI securities are even more suspicious because of the identical sales pattern of ABFI securities belonging to his wife Beverly Santilli, who is also a Director of ABFI.

119.    Defendant Mandia's sales of ABFI securities were suspicious in both timing and amount. Between January 27, 2000 and June 26, 2003, he sold 3,866 shares of IBFS common stock. Over the course of 5 and one-half months within the Class Period, Mandia sold more shares than he ever sold during the entire four years preceding the Class Period. None of Mandia's sales were part of a planned sales program. Mandia's sales during the Class Period far exceeded his sales during the preceding four years, during which he made no open market sales.[6]

120.    The Individual Defendants' Class Period common stock sales are suspicious in both timing and amount because between 1996 and the fall of 2002, none of the Individual Defendants bought or sold any shares of ABFI. In fact, their only trading during a span of seven years from 1996 through June 26, 2003, inclusive, occurred during the Class Period when they were privy to material, adverse, non-public information, on which they traded.

121.    In addition to the Individual Defendants' suspicious sales of ABFI securities, several other factors weigh heavily in favor of a strong inference of scienter on the part of defendants. First, that mortgage lending is the core business function of ABFI weighs in favor of a strong inference of defendants' scienter. Second, each defendant had strong motive and opportunity to commit the

---

[6] In addition, as a result of his positions at the Company, defendant Mandia received substantial compensation. In 2000, Mandia received a salary of $340,000, a bonus of $183,125, and 24,200 options to purchase ABFI stock. In 2001 Mandia received a salary of $366,250, a bonus of $170,000, and 24,200 options to purchase ABFI stock. In 2002, Mandia received a salary of $403,125, and a bonus of $201,563. In 2003, Mandia received a salary of $427,950, and a bonus of $39,002.

fraud complained of herein because the Company needed to complete its debt securitization and offering each quarter in order to remain profitable. Finally, the proximity of ABFI's receipt of the Subpoena on May 14, 2004 and the almost immediate beginning of the revelation of defendants' theretofore wholly undisclosed use of forbearance agreements and deeds in lieu of foreclosure on May 15, 2004, demonstrates scienter.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE MARKET DOCTRINE

122.   At all relevant times, the market for ABFI's securities was an efficient market for the following reasons, among others:

(a)  ABFI's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)  As a regulated issuer, ABFI filed periodic public reports with the SEC and the NASDAQ;

(c)  ABFI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  ABFI was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

123.     As a result of the foregoing, the market for ABFI's securities promptly digested current information regarding ABFI from all publicly available sources and reflected such information in ABFI's stock price. Under these circumstances, all purchasers or acquirers of ABFI's securities during the Class Period suffered similar injury through their purchase or acquisition of ABFI's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

124.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ABFI who knew that those statements were false when made.

## COUNT I
### Violation of Section 10(b) of the Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

125.     Lead Plaintiffs repeat and reiterate the allegations set forth above as though fully set forth herein. This claim is asserted against all defendants.

62

126.    During the Class Period, defendant ABFI and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: a) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; b) artificially inflate and maintain the market price of ABFI's securities; and c) cause Lead Plaintiffs and other members of the Class to purchase or acquire ABFI's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants ABFI and the Individual Defendants, and each of them, took the actions set forth herein.

127.    These defendants: a) employed devices, schemes, and artifices to defraud; b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ABFI's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of ABFI, as alleged below.

128.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with

respect to the Company's operations, financial condition and performance so that the market prices of the Company's securities would be based on truthful, complete and accurate information.

129.    ABFI and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of ABFI as specified herein.

130.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ABFI's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about ABFI and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of ABFI's securities during the Class Period.

131.    Each of the Individual Defendants' primary liability, and control person liability, arises from the following facts: a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; c) the Individual Defendants enjoyed significant

personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

132.    These defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ABFI's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

133.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of ABFI's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of ABFI's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded

by defendants but not disclosed in public statements by defendants during the Class Period, Lead Plaintiffs and the other members of the Class purchased or acquired ABFI securities during the Class Period at artificially high prices and were damaged thereby.

134.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiffs and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of ABFI, which were not disclosed by defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their ABFI securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

135.    By virtue of the foregoing, ABFI and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

136.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation Of Section 20(a) Of**
**The Exchange Act Against The Individual Defendants**

137.    Lead Plaintiffs repeat and reiterate the allegations as set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

138.    Each of the Individual Defendants acted as a controlling person of ABFI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or

66

Case 2:04-cv-00265-TON   Document 22   Filed 08/19/04   Page 60 of 62

intimate knowledge of the Company's actual performance, the Individual Defendants had the power

to influence and control and did influence and control, directly or indirectly, the decision-making of

the Company, including the content and dissemination of the various statements which Lead

Plaintiffs contend are false and misleading. Each of the Individual Defendants was provided with

or had unlimited access to copies of the Company's reports, press releases, public filings and other

statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements

were issued and had the ability to prevent the issuance of the statements or cause the statements to

be corrected.

139.    In addition, each of the Individual Defendants had direct involvement in the day-to-

day operations of the Company and, therefore, is presumed to have had the power to control or

influence the particular transactions giving rise to the securities violations as alleged herein, and

exercised the same.

140.    As set forth above, ABFI and the Individual Defendants each violated Section 10(b)

and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their

controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange

Act. As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiffs and other

members of the Class suffered damages in connection with their purchases of the Company's

securities during the Class Period.

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action, and certifying Lead Plaintiffs

as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel

as counsel for the Class;

(b)  Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated:  August 19, 2004

SCHIFFRIN & BARROWAY, LLP

Katharine M. Ryan - No. 42184
Christopher L. Nelson - No. 85609
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA  19004
(610) 667-7706

LERACH, COUGHLIN, STOIA, GELLER,
  RUDMAN & ROBBINS, LLP
Samuel H. Rudman
David A. Rosenfeld
200 Broadhollow, Suite 406
Melville, NY 11747
(631) 367-7100

LERACH, COUGHLIN, STOIA, GELLER,
  RUDMAN, & ROBBINS LLP
Laura Andracchio
401 B Street, Suite 1700
San Diego, CA 92101
(619) 231-1058

Attorneys for Plaintiffs

G:\American Business Financial Services, Inc. SEC\Final Amended Complaint.wpd

68

## CERTIFICATE OF SERVICE

I, Claudia C. Givens, hereby certify that on August 19, 2004 I caused the following

document **Plaintiffs Consoildated Amended Class Action Complaint** to be served on all

counsel via U.S. First Class Mail.

Marc J. Sonnenfeld
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, Pennsylvania 19103-2921

Counsel for Defendants

Claudia C. Givens